## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| OPEN CHEER & DANCE CHAMPIONSHIP SERIES, LLC, THE OPEN CHEER AND DANCE LLC, AND DEEP SOUTH CHEER, INC. | § § § § | |
| Plaintiff, | § § | |
| vs. | § § | Case No. |
| | § § | _____ |
| VARSITY SPIRIT, LLC, U.S. ALL STAR FEDERATION, INC., INTERNATIONAL ALL STAR FEDERATION, INC. INTERNATIONAL CHEER UNION, AND USA FEDERATION FOR SPORT CHEERING D/B/A USA CHEER | § § § § § § § | JURY TRIAL REQUESTED |
| Defendants. | § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Open Cheer & Dance Championship Series, LLC (the "Open Series"), The Open Cheer and Dance, LLC, ("Open Cheer"), and Deep South Cheer, Inc. ("Deep South") (collectively "Plaintiffs") bring this action for treble damages under the antitrust laws of the United States and the state laws of Texas against Defendants Varsity Spirit, LLC ("Varsity"), U.S. All Star Federation, Inc. ("USASF"), International All Star Federation, Inc. ("ISASF"), International Cheer Union ("ICU"), and USA Federation for Sport Cheering d/b/a USA Cheer ("USA Cheer") (collectively "Defendants") and allege:

1

## INTRODUCTION

1.     This case involves a group boycott in the sport of All Star Cheer. It is about anticompetitive and tortious tactics used by Defendants, the largest All Star Cheer companies in the world, to maintain their stranglehold over the All Star competition market. Defendants' business model depends on them maintaining market power over All Star event producers, gyms, and athletes and keeping their competitors small and weak. This allows Defendants to impose abusive conditions on its consumers, forcing them to pay exorbitant fees to participate in All Star competitions. This results in sub-optimal output, and in the long run, higher prices and reduced quality for the consumers.

2.     The Bain Capital-owned Varsity controls the All Star Cheer industry. Whether it is All Star Cheer apparel, camps, or competitions, Varsity's market power is entrenched.

3.     Varsity became a monopoly the same way most monopolies form—mergers. Over several decades, Varsity acquired about 90% of All Star Cheer competitions by buying up any actual or potential rivals that could possibly threaten its dominance in the All Star competition market.

4.     In addition, to further gain control, Varsity gave cash rebates to All Star gyms based on how many Varsity competitions they attended and how much apparel they bought. Varsity also used exclusionary contracts with All Star gyms. For example, Varsity has employed two types of exclusionary contracts with All Star gyms, which it calls the "Network Agreement" and the "Family Plan," to maintain its dominance in the All Star competition market. Under the Network Agreements, gyms are required to commit to near exclusive attendance at Varsity's All Star competitions. Under the "Family Plan," Varsity makes access to non-penalty prices on All Star competitions contingent on gyms attending Varsity competitions for the vast majority of their

seasons. Varsity focuses its exclusionary conduct on All Star gyms because the gyms recruit, train, organize, and maintain All Star teams. The gyms also select which All Star competitions to attend and make purchasing decisions. As such, All Star gyms are a key input for producing a successful All Star competition.

5.      At the same time, to help Varsity cement its grip on the market, a team of "governing bodies" or "sanctioning bodies" established and backed by Varsity used their rules, regulations, power, and influence to safeguard Varsity's chokepoint control of major cheerleading competitions. As explained below, the Defendants collectively use rules and regulations to impair actual and potential rivals in the All Star Competition market.

6.      The biggest prize for a cheerleading team in competitions is a "bid" to a top All Star championship. The "governing bodies"—Defendants USASF, IASF, ICU, and USA Cheer— work with Varsity to produce and host multiple championship competitions. Rather than staying neutral, the governing bodies have used their power and influence to financially benefit Varsity by allowing Varsity to exercise control over each championship. The governing bodies have conspired with Varsity to pick and choose which companies may award bids to the championships and competitions hosted by Defendants. The Defendants also colluded to try to keep new competitors from successfully hosting their own All Star championships and gaining a foothold in the market. The Defendants use their rules and regulations to benefit Varsity and exclude competitors who might want to host rival competitions.

7.      For example, as explained in more detail below, USASF and IASF have (a) used anticompetitive rules and standards to stop other event producers from putting on a rival non-Varsity championship competition and (b) coerced members of their organizations to cease doing business with Varsity's competitors. The USASF and IASF determine which event producers get

to offer bids to the championship events they co-host. While the USASF and IASF hold themselves out as independent "not for profit" corporations designed to help all their members, USASF and IASF favor Varsity and have taken actions to help Varsity controls the majority of competitions awarding bids to championship competitions. If an event producer cannot offer bids to USASF's and IASF's championship events, then many teams will not attend the events. Similarly, the ICU and USA Cheer are conspiring with the other Defendants to help USASF and IASF use their rules to stop other event producers from putting on a rival non-Varsity championship competition. Upon information and belief, representatives of ICU and USA Cheer have threatened All Star event producers with punitive measures if they continue to do business with Varsity's competitors.

8.      Defendants' systematic and continuing anticompetitive conduct has allowed them to maintain and enhance control over most of the top All Star Cheer championship events. In short, Defendants have gained and maintained significant control of every aspect of All Star Cheer through an anticompetitive scheme consisting of a series of intentional and methodical business maneuvers. Even the President of Varsity has acknowledged that he understands the observation that Varsity controls cheerleading and that he does not apologize for what Varsity does.

9.      With Defendants' control of the market, the cartel has inflated prices, restricted supply, inhibited efficiency, and reduced innovation in the All Star Cheer industry. Thus, Varsity has, in combination with the other Defendants through an unlawful scheme, acquired, enhanced, and maintained monopoly power and/or market power in the All Star competition market, which is the relevant market in this case. Competition in the All Star competition market is conducted throughout the United States, including this District.

10.      For years, All Star gyms and event producers have operated in fear of Defendants, as they long determined which teams got to go to the best All Star Cheer competitions and

championship events. Defendants have imposed exclusionary and coercive agreements and terms on All Star event producers and gyms, causing event producers and gyms to refuse to do business with Varsity's competitors. Event producers and gyms fear retaliation if they cross Varsity.

11.     Despite Defendants' threats, the Open Series and Open Cheer stood up to Defendants and presented a direct challenge to their business model. The Open Series and Open Cheer are two new competitors trying to offer consumers an alternative to Varsity. In 2019, a group of event producers joined together to form the Open Championship Series after realizing the All Star Cheer industry needed solutions to ever-growing prices, lack of choices, and limited championship options caused by Varsity's monopoly. The Open Series was started to help more All Star gyms, families, and athletes participate in All Star Cheer by offering more options. A couple years after the Open Series started, Open Cheer was formed and began offering an alternative championship event for All Star teams and athletes. By offering unique events and more options, the Open Series and Open Cheer were able to push back against Defendants' strong-arm tactics, and thereby created a procompetitive check on Defendants' market power.

12.     The Open Series, Open Cheer, USASF, IASF, ICU, USA Cheer, and Varsity all host separate All Star Cheer championship events. They directly compete with each other in a horizontal market. The Open Series hosts the Open Branson, Open Universal Hollywood, Open Universal Orlando, and Open San Antonio. Open Cheer hosts the Allstar World Championship. USASF and IASF each host the Cheerleading World Championship, which is actually produced by Varsity under a contract between USASF, IASF, and Varsity. ICU and USA Cheer co-host the ICU World Cheerleading Championships. Varsity hosts The Summit Championships and the U.S. Finals. In connection with these championship events there are also qualifying events held by the

Open Series, Deep South, Varsity, USASF's event producer members, IASF's event producer members, and others.

13.     After the Open Series and Open Cheer were organized to compete with Varsity by producing their new championships, Defendants undertook an anticompetitive campaign to try to exclude the Open Series and Open Cheer from the market. Defendants conspired to take anticompetitive measures to prevent the Open Series and Open Cheer from gaining a foothold in the market because they feared it would take away their control of the market. Defendants also began colluding to enforce a boycott of the championships that were beyond their control.

14.     In an effort to destroy the Open Series' and Open Cheer's All Star competitions and championships, Defendants (along with other All Star event producers that make up USASF's and IASF's event producer membership) agreed to boycott (a) the Allstar World Championship; (b) Open Cheer and the Open Series (because of their affiliation with the Allstar World Championship); and (c) any other event producer that produces qualifying events for the Allstar World Championship, such as Deep South. Their agreement also requires event producers to boycott any person or entity in the All Star industry that is not a USASF member, including the Open Series and Open Cheer. In addition, the cheer cartel decided to impose the same requirements on "Cheerleading Worlds Bids recipients," which are the All Star gyms that receive bids to the Cheerleading World Championship. As a result, any gym attending USASF's and IASF's championship event must boycott not just the Allstar World Championship, but also Open Cheer, Open Series, and other non-USASF companies.

15.     To further the boycott, the governing bodies began threatening their members and consumers with punitive measures if they chose to do business with Open Series and Open Cheer. For example, USASF began sending letters to event producer members of the organization that

chose to do business with Open Cheer, threatening to kick any event producer out of the USASF if it did not stop doing business with Open Cheer. If an event producer continued trying do business with both Varsity and Open Cheer, then there would be severe consequences. An event producer would lose its ability to award bids to major championships and be unable to fairly compete against other event producers.

16.     Plaintiff Deep South is one such event producer that lost its USASF membership because it chose to do business with Open Cheer. Deep South is a producer of All Star competitions that awards bids to championship events. Deep South was a USASF event producer member and awarded bids to USASF's Cheerleading World Championship. However, Deep South also wanted to award bids to Open Cheer's Allstar World Championship. Because of Defendants' boycott of Open Cheer, Deep South had its bids to the Cheerleading World Championship taken away and its membership with the USASF revoked. This has resulted in Deep South losing significant revenue. In addition, All Star gyms and teams no longer choose to participate in Deep South's competitions because Deep South cannot award bids to Defendants' championships.

17.     Similarly, the IASF, ICU, and USA Cheer have threatened to punish an event producer if it continues to remain a member of the Open Series and an event producer partner of Open Cheer. The ICU and USA Cheer have also threatened to take away event producers' bids to the championship event they host in conjunction with USASF's and IASF's championship event if an event producer will not cease doing business with the Open Series and Open Cheer.

18.     Defendant Varsity has also plotted with Defendant USASF to try to prevent any other competitor from hosting a "world" championship. Defendant Varsity purportedly assigned its rights to certain trademarks for the phrase "The Cheerleading Worlds" to Defendant USASF, and then Defendant USASF quickly filed a lawsuit trying to prevent the Open Series and Open

Cheer from using the word "world" in the name of their events. Defendant USASF has not made any similar complaints against IASF or ICU for describing their All Star competitions as "world" championships. The Open Series and Open Cheer are being targeted because their new championship events threaten Defendants' control of the market.

19.    Defendants' concerted efforts to crush competition, by trying to prohibit a competitor from being able to compete in the first place, should not be allowed. Such collusion is the supreme evil of antitrust. Defendants' strategy was carried out with the purpose and effect of suppressing competition, maintaining Defendants' market power over its customers, and in the process causing economic harm to the Open Series, Open Cheer, and anyone else that chose to do business with them. Plaintiffs bring this action to put a stop to Defendants' conduct and to recover for such damage.

20.    There is no pro-competitive reason for Defendant' boycott. Rather, Defendants are trying to help Varsity maintain control and protect the cartel's profits. Defendants view the Open Series' and Open Cheer's championships as a mortal threat to their control of the market. Defendants' control over All Star gyms and event producers comes from their ability to pick and choose who gets to go to their prestigious championships. If there is an alternative championship they don't control, then it threatens the entire cartel and could destroy their ability to inflate prices. If there are multiple championships not controlled by Varsity, then Defendants will no longer be able to coerce All Star gyms and event producers to only do business with Varsity because there will be viable alternatives.

21.    Plaintiffs were directly affected by Defendants' boycott. Plaintiffs have suffered antitrust harm because their loss of profits and other losses are directly related to Defendants' conduct and their conspiracy. Defendants' scheme has also hurt consumers by inflating prices,

restricting supply, limiting competition, inhibiting efficiency, lowering quality, and reducing innovation.

22.     In sum, this is a per se case under Section 1 of the Sherman Act, devised and executed by Defendants and their co-conspirators. No offered explanation can alter the fact that the restraint in this case is naked and anti-competitive, and thus not ancillary under the Sherman Act. Its only purpose was to cripple a competitor permanently—to impair the competitive opportunities of a rival in a significant and permanent way. For Defendants, nothing short of a group boycott would do. All of their conduct set forth herein was committed knowingly and intentionally. Defendants' actions in this case goes far beyond the suggestion of mere parallel conduct that could just as well be independent action. There is an actual horizontal agreement and concerted action in violation of Section 1 of the Sherman Act.

23.     The Open Series and Open Cheer have been pushing back against Defendants' illegal conduct. In 2022, the Open Series and Open Cheer asserted claims against USASF and Varsity in an already pending case in the United States District Court in the Middle District of Florida, alleging that their conduct violated Section 1 of the Sherman Act. The claims were dismissed without prejudice after USASF and Varsity opposed having those claims heard in that court. Seemingly emboldened by the dismissal, Defendants doubled down on their conduct and continued to engage in a group boycott.

24.     Accordingly, Plaintiffs bring this action against Defendants for treble damages against Defendants under state and federal antitrust laws and for civil conspiracy and tortious interference under the laws of Texas.

## PARTIES

25.    Plaintiff Open Series is a Texas limited liability company with a principal place of business in Amarillo, Texas. Open Series is the owner of the Open Championship Series. The Open Championship Series comprises hundreds of qualifier events in many regions around the country and across the world. At these qualifier events, All Star Cheer teams compete to earn bids for championship events. The Open Series also hosts championship events for All Star Cheer teams. Plaintiff Open Series was injured and continues to be injured in its business by reason of Defendants' illegal conduct forbidden by the antitrust and other laws.

26.    Plaintiff Open Cheer is a Florida limited liability company with a principal place of business in Amarillo, Texas. Open Cheer hosts the annual Allstar World Championship event in Orlando, Florida, where the world's top All Star Cheer teams compete for a championship in the sport. The Allstar World Championship event is held at the Orange County Convention Center. Plaintiff Open Cheer was injured and continues to be injured in its business by reason of Defendants' illegal conduct forbidden by the antitrust and other laws.

27.    Plaintiff Deep South is a Mississippi for-profit corporation with a principal place of business in Miramar Beach, Mississippi. Deep South produces qualifying All Star Cheer events across the United States. At these qualifier events, All Star Cheer teams compete to earn bids to an Open Championship Series End-of-Year-Event, including the Allstar World Championship. Plaintiff Deep South was injured and continues to be injured in its business by reason of Defendants' illegal conduct forbidden by the antitrust and other laws.

28.    Defendant Varsity is a Tennessee limited liability company with its principal place of business and mailing address at 14460 Varsity Brands Way, Farmers Branch, Texas 75244. Varsity may be served with process by serving its registered agent, Corporate Creations Network,

Inc., at 5444 Westheimer #1000, Houston, Texas 77056. Varsity hosts All Star events and competitions throughout the United States, including in this District.

29.   Defendant USASF is a Tennessee nonprofit mutual benefit corporation with a principal place of business in Memphis, Tennessee. USASF's stated purpose and mission are to establish rules for sanctioning and providing governance for cheerleading, dance, and spirit-related competitions and events; to provide counseling in the administration of cheerleading, dance, and spirit-related competitions and events; and to provide educational and counseling services in the fields of cheerleading, dance, and spirit-related competition and events. USASF has promulgated or enforced rules governing All Star Competitions and, more broadly, the sport of All Star Cheer throughout the United States, including in this District. USASF may be served with process by serving its registered agent, C T Corporation System, at 300 Montvue Rd., Knoxville, Tennessee 37919-5546.

30.   Defendant IASF is a Tennessee nonprofit corporation with a principal office in Memphis, Tennessee. IASF's stated mission is to bring "structure, consistency, safety and growth to the global community of All Star Cheer and Dance." IASF has promulgated or enforced rules governing All Star Competitions and, more broadly, the sport of All Star Cheer throughout the United States, including in this District. IASF may be served with process by serving its registered agent, Burton Brillhart, at 6745 Lenox Center Ct., Suite 300, Memphis, Tennessee 38115-4300.

31.   Defendant ICU is a Texas nonprofit corporation with a principal office in Memphis, Tennessee. ICU claims to be "the recognized world governing body of Cheer" and hosts World Championships. ICU claims that "[n]o corporations or individuals will benefit financially from it" and that its mission and purpose "are strictly to advance the sport." ICU transacts business

across the United States, including this District. ICU may be served with process by serving its registered agent C T Corporation System, at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

32.    Defendant USA Cheer is a Texas nonprofit corporation with a principal office at 13101 Preston Rd., Suite 110-3068, Dallas, Texas 75240-5237. USA Cheer claims it was established in 2007 to serve as the national governing body for sport cheering in the United States. USA Cheer's stated mission is to promote safety and safety education for cheer in the United states and help grow and develop interest and participation in cheer throughout the United States. USA Cheer may be served with process by serving its registered agent C T Corporation System, at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

33.    Plaintiffs have standing and capacity to file this suit and the correct Defendants are being sued in their correct capacity.

<b>JURISDICTION AND VENUE</b>

34.    Plaintiffs' action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1. Plaintiffs seek injunctive relief under 15 U.S.C. §26 and damages under 15 U.S.C. §15(a). This Court has subject matter jurisdiction over the federal antitrust claims under 28 U.S.C. §1331 (federal question) and 28 U.S.C. §1337 (commerce and antitrust regulation); this Court has jurisdiction over the related state-law claims under 28 U.S.C. §1367 (supplemental jurisdiction).

35.    This Court may exercise personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. §22. Defendants transact business in Texas, including in this District. Varsity's principal place of business and mailing address is in the Northern District of Texas. Varsity organizes and promotes annually at least 15 All Star competitions throughout Texas, at least three of which are within the Northern District of Texas. At least one of Varsity's Vice Presidents lives in Amarillo, Texas. USA Cheer's principal place of business and mailing address

are in the Northern District of Texas. USA Cheer either directly or through its affiliates has promulgated or enforced rules governing competitive All Star Cheer and competitions throughout the United States and organized, produced, or managed All Star competition throughout the United States. ICU is a Texas corporation conducting business in the Northern District of Texas. The USASF also transacts business in Texas, including in Amarillo, Texas. USASF offers memberships to All Star athletes, gyms, and event producers located in the Northern District of Texas. USASF actively recruits All Star athletes from this District and receives a flow of funding from this District, including funding from membership dues. In addition, USASF works with other event producers, such as Varsity, to organize and promote annual All Star competitions in the Northern District of Texas that award bids to USASF's event known as The Cheerleading World Championship. USASF routinely holds regional, national, and international events throughout the State of Texas. The IASF also transacts business in Texas, including in the Northern District of Texas. The IASF actively recruits All Star athletes and teams from this District to compete in its championship event that it hosts with USASF.

36.     This Court also may exercise personal jurisdiction over Defendants under Texas Civil Practice & Remedies Code § 15.26. Defendants operated, conducted, engaged in, and carried on a business venture in this state; committed tortious acts within this state that harmed Plaintiffs; and are engaged in substantial and not isolated activity within this state.

37.     The Defendants are also subject to the personal jurisdiction of this Court because of Texas' long-arm statute, Tex. Civ. Prac. & Rem. Code §§ 17.041-17.045, which extends jurisdiction as far as the federal constitutional requirements of due process will permit, provides for specific jurisdiction over nonresident defendants who do business in the State. Further, Defendants purposefully entered into a conspiracy, and performed unlawful acts in furtherance of

the conspiracy, in or from this District, including negotiating with co-conspirators to further a group boycott in violation of federal and state antitrust law, and state tort law, to their benefit. Thus, Defendants have purposefully availed themselves of the privilege of transaction business within the forum State, establishing minimum contacts with this District sufficient to satisfy due process. The exercise of personal jurisdiction by this Court does not offend traditional notions of fair play and substantial justice.

38.     Venue is proper in the Northern District of Texas, Amarillo Division, under Sections 4 and 12 of the Clayton Act (15 U.S.C. §§15, 22) and under 28 U.S.C. §1391(b). Defendants transact business in the United States, including in this District. A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendants' illegal conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District. These effects include artificial restrictions on market output in the All Star competition market and inflated prices for consumers in this District to participate in All Star competitions. The interstate and foreign trade and commerce described in this Complaint is being carried on, at least in part, within this District. Additionally, Defendants may be found and transact business in this District. Defendants are engaged in, and their activities substantially affect, interstate trade and commerce.

## CO-CONSPIRATORS

39.     Various persons, firms, and corporations, who are known or unknown to Plaintiffs, and not named as defendants in this action, including senior executives of the Defendants, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy in violation of the laws asserted herein.

40.     In this Complaint, whenever reference is made to any act of any corporation or entity, the allegations means that the corporation or entity engaged in the act by or through its officers, directors, agents, owners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or entity's business or affairs.

41.     At all times relevant to this Complaint, Defendants conspired to facilitate a group boycott of Plaintiffs.

## TRADE & INTERSTATE COMMERCE

42.     The activities of Defendants and their co-conspirators were within the flow of and substantially affected interstate commerce, namely the organizing, promoting, and managing of All Star Competitions throughout the United States.

43.     The conspiracy described herein between and among Defendants and their co-conspirators had a direct, substantial, and reasonably foreseeable impact on United States commerce.

## SHERMAN ANTITRUST ACT, CLAYTON ACT, AND
## TEXAS FREE ENTERPRISE AND ANTITRUST ACT OF 1983

44.     Defendants combined, conspired, and engaged in a concerted effort to unreasonably restrain trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, et seq., as well as the state antitrust laws of Texas, to eliminate Plaintiffs and other All Star cheerleading event producers as competitors in the relevant market. Defendants brought about the plan and purpose of the unlawful combination and conspiracy by prohibiting members, All Star event producers, and All Star gyms from participating in or sponsoring a "World" championship event that is not sponsored by USASF or controlled by Varsity. This shows one type of trade restraint and public

harm the Sherman Antitrust Act forbids. Plaintiffs cannot sell their services or fairly compete if, because of Defendants' prohibited conduct, event producers cannot do business with Plaintiffs.

45.     Defendants' agreements and conduct are per se violations of the Sherman Antitrust Act, but even if Defendants' group boycott and unlawful market allocation is analyzed under the rule of reason, or any intermediate standard, it is a transparently unreasonable and unlawful restraint of trade.

46.     Accordingly, Plaintiffs seek relief under §1 of the Sherman Antitrust Act (15 U.S.C. §1) which provides in part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

47.     Plaintiffs seek damages from Defendants under §4 of the Clayton Act (15 U.S.C. §15) which provides in part that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore . . . and recover threefold the damages by him sustained, and the cost of the suit, including a reasonable attorney's fee."

48.     Plaintiffs also seek a permanent injunction, under §16 of the Clayton Act (15 U.S.C. §26) which provides in part that: "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . ."

49.     Plaintiffs also seek relief under the Texas Free Enterprise and Antitrust Act of 1983 (Tex. Bus. & Com. Code Ann. § 15.05(a)) which provides that every contract, combination, or conspiracy in restraint of trade or commerce in Texas is unlawful. Specifically, Plaintiffs seek (a) damages under Tex. Bus. & Com. Code Ann. § 15.21(a) for Defendants' violations of the Texas Free Enterprise and Antitrust Act of 1983 and (b) a permanent injunction under Tex. Bus. & Com.

Code Ann. § 15.21(b) to restrain, enjoin, and prohibit further violations by Defendants of the Texas Free Enterprise and Antitrust Act of 1983.

## FACTS

### A. The Sport of All Star Cheer.

50.     All Star Cheer is different from "sideline cheerleading." The sole focus of All Star Cheer is cheerleading itself. It is a specialized form of competitive cheerleading that involves athletes performing a 2½ minute routine composed of tumbling, stunting, pyramids, and dance. It is also an expensive sport, with athletes sometimes spending $15,000.00 or more a year on competitions, uniforms, classes, practice clothes, equipment, and fees.

51.     "All Star Teams" are cheer squads that compete in All Star Cheer competitions. All Star teams are managed through privately owned and operated businesses (All Star gyms) that organize training and practices. All Star gyms coordinate the All Star teams' participation in "All Star Competitions"—paying registration fees, organizing schedules and logistics, and buying their All Star apparel.

52.     All Star Competitions are events produced and promoted for the All Star teams by event producers where All Star Teams compete against each other. The event producers charge All Star gyms registration fees to enter the gym's All Star teams in All Star Competitions.

53.     All Star Competitions include qualifying events as well as championship events that All Star teams can earn "bids" to attend. "Bids" are formal invitations to compete in the championship events. All Star teams earn bids by attending and succeeding at qualifying events. Bids can be fully paid which means that the event producer pays the All Star team's entry fees and costs; partially paid, meaning the event producer pays only a partial amount; or at-large, meaning

that the All Star team can compete but must pay its own way. The event producers determine how bids are awarded.

54.     Competitions are very important to success in All Star Cheer. The business and sport of All Star Cheer are organized around these qualifying and championship events that combine athletes and All Star teams of comparable skill levels. These events provide opportunities for athletes of all ages to compete. For All Star Cheer Teams and their All Star gyms, there are no substitutes for All Star Competitions. The entire discipline is premised and structured around winning competitions and competing in championship competitions. Other sectors of cheerleading—school sponsored teams, youth leagues, athletic associations, and professional teams—have different purposes and different requirements. For athletes, winning competitions is the ultimate goal. Winning a competition allows athletes to compete at championship events and may lead to university scholarships. For All Star Gyms, their ability to survive as a business depends on their ability to have teams compete at and win All Star Competitions. For event producers, All Star Team attendance at their competitions is how they earn a profit.

**B.  The history of All Star Cheer and Varsity.**

55.     Lawrence Herkimer is known as the father of modern cheerleading. He founded the National Cheerleaders Association ("NCA") in 1948 and patented the pom-pom. He also created the "Herkie jump," one of the earliest athletic components added to cheer, while attending Southern Methodist University. The NCA hosted cheer camps and sold sweaters and skirts. At that point in time, there were no cheerleading competitions. All Star Cheer did not yet exist.

56.     Varsity's founder and former CEO is Jeff Webb. Webb originally worked at the NCA after completing his cheerleading career at the University of Oklahoma in the late 1960s. Although Webb was very successful at the NCA, his view of cheerleading's future differed from

Herkimer's. As a result, in 1974, Webb left the NCA and took some of Herkimer's top employees with him to create his own cheerleading business called the Universal Cheerleaders Association ("UCA"). The UCA was similar to the NCA but had more focus on gymnastics-like skills and new tournaments created solely for cheer squads. In connection with the UCA, Webb also created a nonprofit called the "National High School Cheerleading Championships, Inc." This nonprofit had no staff or facilities but reimbursed UCA for services. Ultimately, the UCA outgrew its rival, the NCA, and became the largest cheerleading camp company in the world. The UCA is now a subsidiary and part of the collection of companies known as Varsity.

57.     During the early 1980s, many cheerleading squads not associated with a school or a sports league, whose main objective was competition, began to emerge. Before 1987, the NCA placed All Star Teams into the same divisions as teams that represented schools and sports leagues. In 1986, the NCA created a new division for teams without a sponsoring school or athletic association, calling it the All Star Division and debuting it at its 1987 cheer competitions. As the popularity of this type of "All Star" team grew, more and more of them were formed, attending competitions sponsored by various organizations and companies. The NCA now produces the NCA All Star Nationals, which is a prestigious All Star Competition that hosts more than 25,000 participants each year.

58.     As the industry grew, Varsity began acquiring other cheerleading businesses, apparel companies, and event producers. Riddell acquired Varsity for $91 million in the 1990s. Varsity then became a publicly traded company between 2001 and 2003, before Leonard Green and Partners took the company private in a $131 million deal. In 2014, Charlesbank acquired Varsity for $1.5 billion. Charlesbank helped Varsity orchestrate a series of highly strategic acquisitions, including the purchase of Varsity's main competitor, The JAM Brands. Varsity also

acquired other major competitors, including Spirit Celebrations, Epic Brands, and seven other independent event producers. Four years after Charlesbank's acquisition, Bain Capital acquired Varsity in a $2.5 billion deal.

59.     Varsity is the largest producer of All Star Competitions. Over the years, Varsity has acquired its largest rivals and competitors. In 2004, Varsity bought the National Spirit Group, which gave it ownership and control of Herkimer's NCA. In 2010, Varsity controlled about 50% of the revenues in the All Star Competition market. After Varsity acquired its biggest rival in 2015, it controlled about 90% of the revenues in that market for All Star Competitions in the United States. Varsity hosts more than 600 cheerleading competitions annually. The events attract about 900,000 participants, including hundreds of All Star gyms. Varsity controls approximately 90% of the All Star Competition Market.

60.     After achieving a dominant market share in competitions, Varsity raised prices for those who enter those competitions. For example, after buying Spirit Celebrations, registration fees increased significantly, and participation in tournaments dropped.

61.     Varsity continues to possess monopoly and/or market power in the market for the production of All Star Competitions. Varsity possesses the ability to control, maintain, and increase prices associated with the production of All Star Competitions above competitive levels and the ability to impair and exclude competitors from producing All Star Competitions. Varsity has raised prices charged for registering for and attending Varsity All Star Competitions substantially above competitive levels, and restricted output in the All Star Competition market. Varsity has the ability to foreclose, and has in fact foreclosed, actual and would-be rivals from competing in the market for producing All Star Competitions.

62.     Varsity's actions have resulted in several antitrust suits being filed against Varsity. Most recently, in March 2023, it was announced Varsity had agreed to pay $43 million to settle one antitrust lawsuit.

63.     Varsity has also aggressively lobbied in the past to prevent cheerleading from being considered a sport so that it could remain unregulated. Varsity previously claimed that recognition of cheerleading as a sport "would likely have a material adverse affect on Varsity's business, financial condition and results of operations."[1]

64.     In short, Varsity obtained market power in the All Star competition market by buying up competitors, covertly creating and running the "governing" bodies (discussed below), and cutting deals with All Star gyms to block rivals. As stated in one article: "Varsity has control over cheerleading at every level in the U.S. and abroad."[2] Varsity has also imposed fear of retaliation across the industry.[3] Varsity has such an entrenched competitive position that another article noted that it "stands out as one of the few retail businesses of scale that may also have an Amazon defense."[4]

**C.  A cabal of "governing bodies" colluded to help Varsity control the market.**

65.     Defendants have conspired to foreclose and impair rival All Star Competition event producers from getting traction in the All Star Competition Market. They limit the number of bids

---

[1] *Varsity Brands Owns Cheerleading and Fights to Keep it From Becoming an Official Sport*, Leif Reigstad, Houston Press (July 21, 2015), available at https://www.houstonpress.com/news/varsity-brands-owns-cheerleading-and-fights-to-keep-it-from-becoming-an-official-sport-7606297.
[2] *Id.*
[3] *Id.*
[4] *Bain to Acquire Varsity Brands, a top maker of cheerleader uniforms and school spirit items, for roughly $2.5 billion*, Lauren Hirsch, CNBC (June 19, 2018), available at https://www.cnbc.com/2018/06/19/bain-nears-2-point-5-billion-deal-for-cheer-uniform-leader-varsity-brands.html.

other event producers may award to All Star Championships so that Varsity maintains control of the market.

66.      In 2003, cheerleading coaches formed an independent 501(c)(3) organization, called the National All Star Cheerleading Coaches Congress (NACCC), to establish uniform rules for All Star Cheer. It was an organization open to all coaches, gym owners, and event producers (Varsity and non-Varsity alike). The NACCC first met in Atlanta and voted in the first set of universal All Star Cheer rules.

67.      Varsity saw the creation of the NACCC as a threat to its growing control of the market. So much so, that Varsity helped create and fund the USASF in less than a week of the NACCC gathering. Varsity provided a $1.8 million interest free loan to kickstart the USASF. Varsity submitted the original trademark applications for the marks "U.S. All Star Federation" and "USASF." Until recently, USASF's employees worked at Varsity's offices in Tennessee and were paid directly by Varsity.

68.      After the USASF was formed, Varsity required All Star athletes to purchase a USASF membership to be eligible to compete at Varsity-sponsored events. Varsity obtained "buy in" from prominent gym owners by providing fully paid trips for teams to attend a World Championship event in Orlando. Varsity outspent the NACCC, recruiting key members of the organization, and introduced the "bid" model to the World Championships to force compliance from gym owners. A couple years later, in 2005, the founding members of the NACCC were forced to allow the USASF to absorb the NACCC. USASF reportedly agreed that the NACCC would

become the "rules committee" of USASF in perpetuity as an olive branch. But in just a few years, the NACCC was dissolved by Varsity and USASF.

69.     The USASF was purportedly created to set uniform rules and judging standards for All Star Competitions. It holds itself out as "the national authority for All Star," and represents that it is the nation's largest network of professionals in All Star cheerleading. The membership of USASF consists of many individuals and entities. USASF claims to have more than 150,000 athlete members, 88 event producer members, and 15,000 coaching members.

70.     The majority of USASF's event producer members are owned or controlled by Varsity. In addition, a permanent majority of USASF's voting board members were allocated to seven All Star Competition brands, all of which were or are owned by Varsity.

71.     Varsity also helped create another organization similar to the USASF—the IASF. The USASF and IASF host All Star Competitions known as The Cheerleading World Championship. The IASF operates similarly to the USASF. The IASF purportedly provides a credentialing platform for event producers and enforces rules and regulations for All Star competitions.

72.     In 2004, Varsity also helped create the ICU to act as another "governing body." The President of the ICU is Jeff Webb, the founder of Varsity. Many of ICU's officers and councilmembers are Varsity employees. The ICU also has a management agreement with Varsity. Moreover, the ICU receives a share of USASF's revenue. The ICU receives a portion of the revenue from the Cheerleading World Championship co-hosted by USASF and IASF.

73.     In 2007, Varsity next helped create USA Cheer with a multimillion-dollar, interest free loan. At the end of 2021, USA Cheer had an interest-free, revolving line of credit loan with Varsity with a balance of $4,792,767.00. USA Cheer holds itself out as a national governing body

for cheerleading in the United States. USA Cheer has shared its address and telephone number with Varsity. USA Cheer has contracted with Varsity to use Varsity's employees as needed. For many years, USA Cheer and Varsity shared the same president. USA Cheer and Varsity have entered into service agreements under which USA Cheer's employees were compensated by Varsity.

74.    USASF is a "member" of USA Cheer. USA Cheer collaborates with USASF and hosts events with USASF. Upon information and belief, USA Cheer receives a portion of the revenue from the Cheerleading World Championship co-hosted by USASF and IASF.

75.    According to USA Cheer, "most All Star clubs, teams, and competitions are under the umbrella" of USASF, meaning that USASF rules govern most All Star teams, gyms, and competitions. USASF, with the help of USA Cheer and the other Defendants, divert All Star teams and gyms to All Star Competitions owned and produced by Varsity rather than those owned and produced by the Open Series, Open Cheer, and other event producers. USASF and USA Cheer work with Varsity to influence All Star Gyms' purchasing decisions. USASF has forced gyms to report their entire cheerleading schedule, and through a third-party relationship with a liability insurance provider, it effectively raises prices on gyms who compete at non-USASF events.

76.    Varsity's founder, Jeff Webb, has reportedly said these "governing bodies" were created to help Varsity gain more control: "It wasn't because we wanted some governing body to f—ing tell us what to do. It was our strategy to take over all-star cheerleading, and it f—ing worked, too."[5]

77.    As explained more below, Defendants have together: (1) limited the number of championship-qualifier events that independent event producers can put on; (2) prevented rivals

---

[5] *Varsity-Backed Cheer Governing Body Faces Debt & Obligations*, Daniel Libit, Sportico (Jan. 23, 2023), available at https://www.sportico.com/leagues/other-sports/2023/varsity-backed-usa-cheer-1234699831/.

from creating their own championship events; (3) pressured teams to attend only USASF-sanctioned or Varsity sponsored competitions; (4) prohibited certain competitions within certain miles of each other and within certain dates; and (5) enforced restrictive rules that favor Varsity.

78.     Defendants' scheme has led to reduced output, increased prices, and reduced choice in the All Star Competition Market.

**D.  Plaintiffs and Defendants compete against each other in the All Star Competition Market.**

79.     All Star Teams compete against each other at All Star Competitions. Teams often need to travel great distances to attend events. Athletes practice year-round to perfect their performances for about half a dozen events each year. At a typical competition, teams perform a 2-and-a-half-minute routine with music that includes stunts, jumps, and tumbling. The teams are judged by a panel of cheerleading experts on difficulty and execution. Besides winning a trophy or a bid, All Star athletes can be awarded scholarships. Colleges look to All Star Gyms before looking at high schools for potential cheerleading team members. This is another reason why All Star Gyms need to be as successful as possible.

80.     There are hundreds of All Star Competitions annually. Varsity alone hosts more than 600 regional and national events, which it brands under unique banners. Most All Star Teams attend a handful of All Star Competitions each season. They set their schedule with the goal of earning a bid to one or more of the All Star championship events. Competitions that offer bids to an All Star championship event are much more attractive to All Star Teams and Gyms. Because an All Star Team cannot attend an All Star championship event without a bid, the limited number of bids makes them highly coveted and prestigious.

81.     USASF is an event producer in the All Star Competition Market. Since 2004, USASF has hosted annual championship events called "The Cheerleading World Championship"

and "The Dance World Championship." The IASF hosts these events with the USASF, and the entire event is sometimes collectively referred to as the "World Cheerleading Championships":



82.     The USASF often refers to its events at the World Cheerleading Championships as the "The Cheerleading Worlds" and "The Dance Worlds." The IASF often refers to its events as the "IASF Worlds."

83.     Although the USASF and IASF are the "hosts" of The Cheerleading World Championship, The Dance World Championship, and IASF Worlds events, they contract with Varsity[6] to produce the events. When USASF first established its championship event, USASF offered Varsity a no-contest bid to produce the event, and it did not allow any other event producer to compete for the right to produce the event. Upon information and belief, USASF has never allowed any other event producer to compete for the right to produce the event.

84.     USASF's and IASF's championship events take place each April at Disney's ESPN Wide World of Sports in Orlando, Florida. This year, the event took place April 21-24, 2023.

---

[6] Varsity Spirit, LLC, Varsity Brands, LLC, and Varsity Fashion, LLC all affirmatively and collectively represent themselves as one corporate family, rather than separate subsidiaries and parents. Upon information and belief, USASF also contracts with Varsity Brands, LLC.

USASF and IASF partner with Walt Disney World to provide hotel accommodations for All Star teams and athletes that participate in the events.

85.    USASF, IASF, and Varsity decide which qualifying events will have the right to award bids to The Cheerleading World Championship. USASF, IASF, and Varsity restrict competition in the All Star competition market by limiting the number of All Star competitions that can produce bids to The Cheerleading World Championship. Varsity owns the majority of these All Star competitions with the right to award bids to The Cheerleading World Championship. USASF and IASF also allocate the number of bids that each All Star competition may award. USASF and IASF have awarded Varsity the vast majority, so Varsity controls more than 80% of The Cheerleading World Championship bids. The qualifying events for the Cheerleading World Championship take place all across the United States, including in this District.

86.    Since 2005, the ICU has hosted its own championship event similarly called the World Cheerleading Championships in conjunction with The Cheerleading World Championship or World Cheerleading Championships hosted by USASF and IASF. It is also called the ICU World Championship or ICU Worlds:



87.     Upon information and belief, USA Cheer helps host the ICU's event. The ICU's event is held each year at Disney's ESPN Wide World of Sports in Orlando, Florida. This year, the event took place April 19-21, 2023, just before The Cheerleading World Championship. As with the USASF's and IASF's Cheerleading World Championship, the ICU partners with Walt Disney World to provide hotel accommodations. The ICU World Championship is a competing event of the Cheerleading World Championship in the All Star Competition Market.

88.     In 2013, Varsity decided to start offering a new, definitive championship event for All Star teams. So, Varsity began hosting its own championship events called "The Summit Championships" and "The D2 Summit." These championship events are also held each year at Disney's ESPN Wide World of Sports in Orlando, Florida. The Summit is held each April, and The D2 Summit is usually held each May. This year, The Summit took place April 27-30, 2023, which is just after USASF's and IASF's The Cheerleading World Championship. The D2 Summit takes place May 5-7, 2023. As with the USASF and IASF's Cheerleading World Championship, Varsity partners with Walt Disney World to provide hotel accommodations. Varsity hosts this year-end championship event, the Summit, and it competes with other year-end championship events.

89.     Varsity decides which All Star competitions have the authority to award bids to The Summit and The D2 Summit. Varsity has used its market dominance to restrict competition by historically allocating 100% of The Summit and The D2 Summit bids exclusively to All Star competitions it owns and operates.

90.     Since 2009, Varsity has also hosted and produced the U.S. Finals, which is an event that takes place in multiple locations and then the scores from the various locations are compared. For example, in the 2020-21 season, one of the U.S. Finals events took place in this District. To

participate in a U.S. Final event, an All Star Team must receive a bid. Varsity decides which All Star Competitions have the authority to award bids to the U.S. Finals. The U.S. Finals event competes with other year-end championship events in the All Star Competition Market.

91.     Defendants use their dominance of the All Star competition market to ensure that All Star teams will attend Varsity's entry level All Star competitions and qualifying events rather than those produced by Varsity's competitors, such as the Open Series and Open Cheer and other independent event producers like Deep South.

92.     To create an alternative in the All Star Cheer industry, the Open Series began organizing, promoting, and managing All Star Competition events as part of its Open Championship Series. In connection with the Open Championship Series, Open Cheer began producing its own championship event for All Star teams called the "Allstar World Championship." This event takes place in May each year at the Orange County Convention Center in Orlando, Florida. Open Cheer partners with Universal Orlando Resort to provide hotel accommodation. Open Cheer is not a member of USASF.

93.     Defendants directly compete with each other and Plaintiffs in organizing, promoting, producing, and managing All Star Competitions. As explained in this Complaint, Defendants have agreed to boycott Plaintiffs.

94.     USASF's event producer members, including those members owned by Varsity, directly compete with each other and with non-USASF event producers, like Open Series, Open Cheer, and Deep South, in organizing, promoting, producing, and managing All Star Competitions. USASF's event producers, including those members owned by Varsity, have agreed to boycott Plaintiffs.

95.    Plaintiffs, Defendants, and other All Star event producers directly compete in organizing, promoting, producing, and managing All Star Competitions. Defendants and other All Star event producers have agreed to boycott Plaintiffs.

96.    Plaintiffs Open Series and Open Cheer, Defendants, and other All Star championship event producers directly compete in organizing, promoting, producing, and managing All Star Championship Competitions. Defendants and other All Star event producers have agreed to boycott the Allstar World Championship and other championship events hosted by the Open Series.

**E.  The relevant market is the All Star Competition Market.**

97.    All Star Competitions are events at which All Star Teams perform time-limited routines composed of tumbling, stunting, pyramids, and dance segments. The routines are performed and scored against other All Star Teams at various local, regional, national, and world competitions. All Star Teams train vigorously for All Star Competitions.

98.    All Star Competitions involve All Star Teams with athletes from different age groups. All Star Competitions are not sponsored by or associated with particular schools or school associations, such as the NCAA.

99.    Suppliers in the All Star Competition Market are All Star Competition producers. Plaintiffs and Defendants are All Star Competition producers. Varsity is the primary supplier in the All Star Competition Market.

100.    All of Varsity's All Star Competitions are sanctioned by USASF. On the other hand, none of Plaintiffs' All Star competitions are sanctioned by USASF.

101.    Championship event producers rely on other event producers to organize qualifying events so that All Star teams can compete to earn a bid to the championship events.

102.    There are natural barriers to entry in this market. An All Star Competition producer must have access to capital in order to rent venues, perform adequate marketing, and pay employees, travel costs, and other expenses associated with producing an All Star Competition. An All Star Competition producer must also have access to a critical mass of All Star Teams and judges in order to host a competition.

103.    All Star Gyms pay All Star Competition producers registration fees to enter All Star Competitions leading up to All Star Championship events. For All Star Gyms, All Star Competitions lack close economic substitutes that could constrain their pricing to competitive levels.

104.    All Star Competitions are not reasonably interchangeable with less competitive cheer competitions. For example, All Star Teams and Gyms would not choose to participate in competitive gymnastics, sideline cheer, dance, or any other sport or pastime in response to a small but significant non-transitory increase in the price of attending All Star Competitions.

105.    Sideline cheerleading is not a functional or economic substitute for All Star Competitions. For sideline cheerleading, the primary purpose is to support a school's sports team. All Star Teams do not cheer for games or for other teams. Sideline cheerleading also takes place in a very different setting—a non-spring loaded floor, often on the sideline of hardwood basketball courts or football fields, rather than the open spring-loaded floors used by All Star Teams. Sideline cheerleading also involves fewer stunts and less rigorous tumbling. The skill required in All Star Competitions is much more advanced than that required for sideline cheerleading. Likewise, gymnastic and dance competitions are also not functional or economic substitutes for All Star Competitions. The skill set required to be part of an All Star Team is different.

106.     The relevant geographic market is the United States. All Star Teams compete to receive bids to attend All Star Championship events in the United States. International cheer competitions are not functional or economic substitutes for U.S. All Star Competitions. A small but significant and non-transitory increase in the price of participating in U.S. All Star Competitions would not cause participants to seek out international championship competitions.

**F. Defendants have colluded to destroy competition in the All Star Competition Market by engaging in an illegal group boycott.**

107.     USASF requires all of its event producer members that it partners with to sign a Membership Agreement.

108.     On April 6, 2022, Steve Peterson, USASF's Vice President of USASF Events and Corporate Alliances, sent an email to USASF's event producer members. The email stated, "The USASF has updated the 2022-2023 Company Member Agreements. Based on all current and updated guidelines in the 2022-2023 Company Member Agreements, all USASF Member Event Producers for the 22-23 season will be prohibited from **directly** or **indirectly** being affiliated with any year-end multi-brand event that is: (a) not USASF Sanctioned; (b) a cheerleading or dance "World" championship event conducted by a third party." (emphasis in original). Currently, only one All Star world championship meets this description: the Allstar World Championship.

109.     As described by Mr. Peterson, the 2022-2023 USASF event producer Membership Agreements require all USASF company members to boycott (1) the Allstar World Championship, (2) Open Series and Open Cheer (because of their affiliation with the Allstar World Championship), and (3) any other event producer that produces qualifying events for the Allstar World Championship.

110.     The Membership Agreements further require USASF event producers to boycott any person or entity in the All Star industry that is not a USASF member, including Plaintiffs. The

Membership Agreements specifically require event producers to "avoid working with those that do not support the USASF's mission." The Agreements state, "working with others that do not support the mission is grounds for revocation of the Company's membership, at the sole discretion of the USASF."

111.    In addition, the Membership Agreements require all USASF event producers to impose the same requirements on their "Worlds Bids recipients" (the All Star gyms that receive bids to the Cheerleading World Championship from USASF or IASF event producers). Thus, USASF requires any gym attending the Cheerleading World Championship to boycott not just the Allstar World Championship, but also Open Cheer and any other non-USASF member event producer.

112.    USASF has also sent out letters to member All Star Gyms, Teams, and Event Producers stating that no athlete, coach, judge, or official is permitted to participate in any way in any event that claims to be a "World or International" championship other than the ICU's World Championship or the USASF/IASF Cheerleading World Championship. Of course, USASF has not prevented Varsity from hosting its own world championship event, The Summit.

113.    USASF membership has historically been considered essential for an event producer to effectively compete in the relevant market. Refusing to engage in a boycott of the Allstar World Championship would cause the event producers to lose their USASF membership, which would raise a significant (and often insurmountable) hurdle to competing in the relevant market. Therefore, to maintain their USASF membership and their ability to compete, many of USASF's event producer members have agreed, or will agree, to boycott the Allstar World Championship, Open Cheer, Open Series, Deep South, and other non-USASF event producers, as demanded by Defendants.

114.    Defendants IASF, ICU, and USA Cheer have agreed to help USASF and Varsity enforce and facilitate a boycott of Plaintiffs. Defendants have threatened to take away business opportunities from companies if they continue to do business with Open Series and Open Cheer. Defendants have also threatened to take away event producers "bids" to competitions hosted by Defendants. Such threats are interfering with Plaintiffs' business relationships and restricting competition.

115.    Event producers are being coerced into the boycott, not voluntarily agreeing to temporary "exclusivity agreements." Defendants are forcing event producers to choose between assisting Defendants in injuring their competitors or working exclusively with their competitors, knowing that because of Defendants' market power very few event producers will be able to rely exclusively on their competitors. That event producers may technically have a choice does not mean the group boycott is not coercive.

116.    Likewise, All Star gyms seek The Cheerleading World Championship bids because such bids are highly valued by All Star athletes and parents, and an All Star gym or team that obtains a bid to The Cheerleading World Championship will be more competitive in the All Star gym market. Refusing to engage in a boycott of the Allstar World Championship and other non-USASF event producers would cause these All Star gyms to lose their bids to The Cheerleading World Championship under the requirements imposed by USASF and Varsity in the Membership Agreements. Therefore, to maintain their ability to obtain bids to The Cheerleading World Championship, All Star gyms that are otherwise eligible for The Cheerleading World Championship bids have agreed, or will agree, to boycott the Allstar World Championship, Open Series, Open Cheer, Deep South, and other non-USASF event producers, as demanded by

Defendants. Defendants went far beyond giving event producers a unilateral choice and are forcing event producers to avoid dealing with Plaintiffs so that they can gain a competitive edge.

117.    Defendants are accordingly engaged in a joint effort with each other and their other members/partners, including those members owned by Varsity, to disadvantage competitors, including Plaintiffs, by either directly denying, or by persuading and/or coercing event producers and All Star teams to deny, the relationships the competitors need in the competitive struggle. Defendants' boycott cuts off access to the market necessary to enable Plaintiffs and others to compete.

118.    Defendants have also agreed to divide markets. USASF's Membership Agreement represents a horizontal agreement between USASF and event producers, including Varsity, all of whom are competitors or potential competitors in the All Star Competition market, to divide and allocate customers, territory, and/or products between competitors within the same horizontal market. The Membership Agreement gives USASF the sole right to host "world" championship events and the sole right to conduct a "Level 6 and 7" All Star Competition on a certain date. Thus, the Membership Agreement imposes naked restraints on trade with no pro-competitive justifications. In addition, upon information and belief, there is a horizontal agreement between Defendants under which Varsity has the sole right to host championship events (The Summit and The D2 Summit) for All Star teams or athletes that may not be able to compete at The Cheerleading World Championship. While it is not an official title, The Summit is a world championship for younger All Star teams. Upon information and belief, there is a horizontal agreement between Defendants under which each of them has the sole right to host an All Star championship competition for All Star teams on certain dates. Thus, Defendants have allocated customers and products within the same horizontal market.

119.    Further, USASF also schemed with Varsity, with the support of the other Defendants, to prohibit All Star Competition event producers from holding bid-qualifying All Star Competitions within 500 miles of another bid-qualifying competition. This makes it nearly impossible for an event producer to expand and compete with Varsity, as Varsity already holds competitions nationwide throughout the year.

120.    The Membership Agreement and Defendants' anti-competitive conduct also creates significant competitive disadvantages to USASF's own members, as well as to competition and consumers. To be viable in the All Star Competition market, event producers must be able to offer bids to All Star championships. USASF already limits the number of All Star Competitions that can award bids to its championship event, and Varsity owns most of the competitions that award bids to USASF's championship event. The Membership Agreement and boycott impose even more restrictions on an event producer's ability to award bids and limits an event producer's ability to market and sell its products. This ultimately results in less opportunities for All Star teams to compete and results in Defendants raising the price to compete at their championship events above a competitive level, since all their rivals have been driven from the market. A new competitor in the All Star Competition Market is unlikely to be able to offer bids and thus would immediately be rendered competitively irrelevant.

121.    Defendants know that the Membership Agreement and boycott forecloses competition by Plaintiffs and other competitors. Defendants are knowingly using their market power to preclude and bar competitive entry into the market. IASF, ICU, and USA Cheer are colluding to help USASF and Varsity enforce the boycott created by the Membership Agreement.

122.    The Membership Agreement and boycott lacks sufficient grounding to meet the competitive needs of Defendants, and it is broader than necessary to accomplish any legitimate

objective of Defendants. Unlike USASF's rules and regulations governing safety, scoring, and athlete protection, Defendants' boycott requirements serve no pro-competitive purpose and are instead expressly intended to foreclose competition with Defendants in the relevant market.

123.    The Membership Agreement and boycott will continue to inflict a severe competitive handicap on Plaintiffs. The All Star Competition market will continue to be restricted, suppressed, and restrained, and All Star athletes, teams, and gyms will continue to be deprived of the opportunity to participate in additional All Star Competitions.

124.    In addition to the express agreement reflected in the Membership Agreement, Defendants also entered into an agreement to engage in a mass marketing campaign encouraging consumers in the relevant market to boycott Plaintiffs and other non-USASF members.  As part of this agreement, USASF and its event producer members agreed to a "rollout timeline" to ensure that the marketing of their group boycott would be effectively received by consumers over a long period of time.

125.    USASF requires its member Gyms to report their full competition schedules for the year. USASF shares this information with Varsity, and both Varsity and USASF representatives then pressure All Star Gyms to not do business with non-USASF event producers, such as Plaintiffs. The other Defendants also pressure consumers to not do business with non-USASF event producers, such as Plaintiffs.

126.    As a direct and proximate result of Defendants' conduct as described above, Plaintiffs will suffer, absent permanent injunctive relief, substantial injury to their businesses, property, trade, and reputation in amounts which are undetermined.

127.    As a direct and proximate result of Defendants' conduct as described above, consumers have been harmed. The Defendants' scheme has resulted in higher prices for All Star

Teams and athletes to compete at All Star Competitions and lower output of All Star Competitions. As a result of Defendants' action, All Star Gyms and event producers have been forced to close. With less options, Defendants may charge higher prices for All Star Competitions.

128.    The scheme has also resulted in terrible outcomes and lower quality. According to other lawsuits, the scheme allowed Varsity, USASF, and USA Cheer to resist the demand to prevent sexual abuse of children in the industry. A USA Today article alleged that 140 people who continued to work unrestricted in the All Star Cheer industry have been convicted of sex crimes against minors, 74 of whom are registered sex offenders.[7] USASF's system for checking the backgrounds of coaches and gym owners only flagged 21 people before USA Today reporters began their investigation. USASF also only banned these 21 people from going "backstage" at USASF events and let them continue to work with children in the industry. In response to complaints from customers, USASF and Varsity refused to take any immediate action because their market power and lack of effective competition allowed them to resist calls for a more rigid, restrictive, and expensive background check system. Thus, Defendants' collusion contributed to Defendants providing an unacceptable environment for gym owners, parents, and children.

129.    Defendants' collusion is not just economically wrong, it is morally wrong. *See* THURMAN ARNOLD, FAIR FIGHTS AND FOUL: A DISSENTING LAWYER'S LIFE, 129 (Harcourt, Brace & World, Inc. 1951) (the Sherman Act reflects the United States' "abiding faith that the elimination of competition in business [is] morally and economically wrong."). The "supreme evil of antitrust" is collusion. *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (Scalia, J.). Defendants' collusion must be stopped.

---

[7]https://www.usatoday.com/restricted/?return=https%3A%2F%2Fwww.usatoday.com%2Fin-depth%2Fnews%2Finvestigations%2F2020%2F09%2F18%2Fcheerleading-cheer-investigation-sexual-misconduct-sex-offender-banned-list%2F3377622001%2F; *see also* https://www.usatoday.com/story/opinion/2022/01/21/cheer-jerry-harris-netflix-sexual-misconduct-allegations/6586303001/.

130.   The irreparable injuries which Plaintiffs will suffer absent permanent injunctive relief, and the benefits to the public which will result from protecting competition in the All Star Competition Market, entitles Plaintiffs to the injunctive relief sought.

### COUNT ONE
### VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

131.   Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

132.   Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably retrain trade and commerce in the relevant market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

133.   Defendants contracted, combined, and conspired to restrain trade in the relevant market by entering into a horizontal agreement to (a) boycott and/or refuse to deal with Open Series and Open Cheer (and the Allstar World Championship) and other non-USASF event producers such as Deep South; (b) exclude Open Series, Open Cheer, and other non-USASF members such as Deep South from the relevant market and thus try to drive them out of business; and (c) divide and allocate customers, territory, and/or products between competitors within the same horizontal market.

134.   Defendants implemented a per se illegal group boycott by (a) refusing to deal with Open Series and Open Cheer (and the Allstar World Championship) and other non-USASF event producers, including Deep South; and (b) agreeing to expand the anticompetitive requirements of their horizontal agreements with each other to their individual vertical agreements with All Star gyms and teams, thus trying to drive competitors like Open Series and Open Cheer (and the Allstar World Championship) and other non-USASF event producers, including Deep South, out of business.

135.    Defendants' conduct lacks any pro-competitive justification and unduly thwarts competition. The anti-competitive effect of this restraint of trade is outweighed by any beneficial effect on or to competition.

136.    Thus, by Defendants' conduct described above and through the Member Agreement, Defendants and their partners have unreasonably restrained and continue to unreasonably restrain competition in the All Star Cheerleading competition market.

137.    Defendants' concerted refusal to deal with, unlawful allocation, and/or boycott of Plaintiffs and other All Star Cheerleading competitions constitutes a per se unreasonable restraint under Section 1 of the Sherman Act, 15 U.S.C. § 1.

138.    Alternatively, Defendants' concerted refusal to deal with, unlawful allocation, and/or boycott of Plaintiffs and other All Star Cheerleading event producers also constitutes, under the rule of reason or quick look analysis, unreasonable restraints under Section 1 of the Sherman Act, 15 U.S.C. § 1.

139.    Alternatively, with respect to Defendants IASF, ICU, and USA Cheer, and perhaps others to be named later, their actions constitute an independent personal stake in achieving the objective of the conspiracy, name in restraining the trade or commerce of Plaintiffs. These Defendants either directly or indirectly threatened other third parties with punitive measures should they maintain a business relationship with Plaintiffs.

140.    As a result of Defendants' actions, Plaintiffs have suffered antitrust injury.

141.    The unlawful conspiracy has had the effect of restraining, suppressing, and eliminating competition in the All Star Competition market. As a direct and proximate result of Defendants' concerted conduct, consumers (All Star gyms and athletes) in the All Star competition market have been harmed. USASF's membership requirements have resulted in fewer

championship events being available to consumers, resulting in USASF event producer members, including Varsity, being able to raise the price to compete at championship events above a competitive level. Further, because of USASF's and its members' agreement, most consumers can only attend "world" championship events that have been sanctioned by USASF (which include The Cheerleading World Championship and the ICU World Cheerleading Championships, both of which are produced by Varsity through its contracts with USASF and the ICU), resulting in Defendants being able to raise the price to compete at a "world" championship event above a competitive level.

142.    As a direct and proximate result of Defendants' concerted conduct, Plaintiffs and other non-USASF event producers have been and will remain irreparably injured and financially damaged in their business and property in that, among other things, Plaintiffs and other non-USASF event producers have suffered and will continue to suffer significant lost revenue and profits from the substantial decrease in All Star teams, gyms, and event producers that are allowed to do business with Plaintiffs and other non-USASF members. The injury to Plaintiffs consists of losing crucial opportunities to grow their business, loss of consumers because of the new boycott requirements, decrease in its reputation and goodwill, and inability to attract and retain All Star teams to attend their competitions.

143.    Due to Defendants' concerted conduct, market power, the barriers to entering the relevant market, and the resulting anticompetitive and antitrust injury, Defendants have violated Section 1 of the Sherman Act, 15 U.S.C. § 1, under a per se, quick-look, and rule of reason standard.

## COUNT TWO
## VIOLATIONS OF THE TEXAS ANTITRUST LAW

144.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

41

145.    By its conduct described above, Defendants have violated Section 15.05(a) of the Texas Free Enterprise and Antitrust Act of 1983 by conspiring, collaborating, and/or contracting with others to boycott Plaintiffs and to restrain trade or commerce in Texas.

146.    As alleged, Defendants contracted, combined, and conspired to restrain trade in the relevant market by entering into a horizontal agreement to (a) boycott and/or refuse to deal with Open Series and Open Cheer (and the Allstar World Championship) and other non-USASF event producers such as Deep South; (b) exclude Open Series, Open Cheer, and other non-USASF members such as Deep South from the relevant market and thus try to drive them out of business; and (c) divide and allocate customers, territory, and/or products between competitors within the same horizontal market.

147.    Defendants implemented a per se illegal group boycott by (a) refusing to deal with Open Series and Open Cheer (and the Allstar World Championship) and other non-USASF event producers, including Deep South; and (b) agreeing to expand the anticompetitive requirements of their horizontal agreements with each other to their individual vertical agreements with All Star gyms and teams, thus trying to drive competitors like Open Series and Open Cheer (and the Allstar World Championship) and other non-USASF event producers, including Deep South, out of business.

148.    The action and conduct on the part of the Defendants was flagrant and willful, was done for the specific purpose of harming Plaintiffs and illegally and improperly boycotting Plaintiffs' business. This action and conduct on the part of the Defendants greatly damaged Plaintiffs. Thus, pursuant to Section 15.21(a)(1) of the Texas Business and Commerce Code, Plaintiffs are entitled to recover three times its actual damages and its reasonable attorney's fees.

**COUNT THREE**
**TORTIOUS INTERFERENCE WITH**
**BUSINESS RELATIONSHIPS AND/OR EXPECTANCY**

149.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

150.     There was a reasonable probability that Plaintiffs would have entered into a business relationship with other event producers, gyms, athletes, or parents of athletes in connection with All Star competitions. Plaintiffs had more than a subjective belief that they would complete these contracts because they were a supplier in the All Star competition market and offered competitions at a lower cost than Defendants.

151.     Defendants knew about the relationships or expectancies between Plaintiffs and event producers, gyms, athletes, and parents of athletes, and chose to interfere. Defendants had a conscious desire to prevent relationships from occurring between Plaintiffs and event producers, gyms, athletes, or parents of athletes. Defendants' interference was the proximate cause of Plaintiffs' injury, as but for Defendants' interference, event producers, gyms, athletes, or parents of athletes would have contracted with Plaintiffs to participate in their All Star competitions.

152.     Defendants' conduct is an independently unlawful act because (a) Defendants' conduct is anticompetitive, violating federal and state antitrust law, (b) Defendant's conduct amounts to the Texas tort of civil conspiracy, and (c) Defendants acted with malice and without a valid business justification—the interference served no legitimate business or economic purpose. Defendants persuaded others to conduct or participate in an illegal boycott.

153.     Defendants were not motivated by legitimate business reasons. Defendants do not have legitimate business justification for their interference.

154.    Defendants' interference was the direct and proximate cause of Plaintiffs' inability to do business with event producers, gyms, athletes, and parents of athletes and ultimately obtain contracts with those entities and/or persons.

155.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered damages.

**COUNT FOUR**
**CIVIL CONSPIRACY**

156.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

157.    Defendants combined, through concerted action, to accomplish an unlawful purpose.

158.    The purpose of this conspiracy was unlawful because the agreements were an unlawful restraint of trade in violation of state and federal antitrust laws and Defendants' conduct amounts to tortious interference with a business expectancy in violation of state law.

159.    Defendants acted together under a common plan or design.

160.    As a direct and proximate result of the conspiracy, Plaintiffs were injured and suffered damages. Thus, Plaintiffs may hold each Defendant that is a conspiracy participant liable for the torts committed by another participant. Plaintiff seeks to impose joint and several liability on all Defendants for any damages resulting from the acts in furtherance of the conspiracy.

**JURY TRIAL DEMANDED**

161.    Pursuant to Fed. R. Civ. P. 38(c), Plaintiffs demand a trial by jury on all issues so triable.

**REQUEST FOR RELIEF**

162.    Plaintiffs asks the Court to grant the following relief:

a.      The above-described violations by Defendants of § 1 of the Sherman Antitrust Act entitle Plaintiffs to injunctive relief, including a permanent injunction under § 16 of the Clayton Act. The above-described violations by Defendants of Section 15.05 of the Texas Free Enterprise and Antitrust Act of 1983 also entitles Plaintiffs to injunctive relief, including a permanent injunction under Section 15.21 of the Texas Free Enterprise and Antitrust Act of 1983. As a result, Plaintiffs ask that the Court issue a permanent injunction restraining, enjoining, and prohibiting Defendants from future violations of the antitrust laws and from practices that facilitate those violations. Plaintiff specifically asks for a permanent injuncting restraining, enjoining, and prohibiting Defendants from engaging in any of these acts:

    i.    Continuing to enforce the unlawful provisions of USASF's Membership Agreement, including Paragraphs 4, 6, and 15 of the Membership Agreement, by refusing to allow USASF's members to participate in non-USASF world championship events and/or work with non-USASF members;

    ii.    Any other action having the effect of refusing to allow members or consumers to participate in non-USASF world championship events and/or work with non-USASF members; and

    iii.    Imposing on a USASF member any other new and anti-competitive limitations relating to a member's participation in a non-USASF world championship event and/or ability to work with non-USASF members.

b.      Adjudge and decree that the acts of Defendants as alleged in Counts One and Two constitute an illegal agreement that unreasonably restrains competition in

violation of §1 of the Sherman Act and the Texas Free Enterprise and Antitrust Act of 1983.

      c.     Award Plaintiffs actual damages, incidental and consequential damages including lost profits damages and treble the amount of damages determined to have been sustained by them and enter a judgment for Plaintiffs against Defendants, for such sum, together with all prejudgment and post-judgment interest provided by law.

      d.     Restitution and disgorgement.

      e.     Order that the Plaintiffs recover from Defendants, the cost of this suit and all reasonable attorneys' fees incurred, such amounts to be fixed by the Court as required by Sections 4 and 16 of the Clayton Act and Section 15.21 of the Texas Free Enterprise and Antitrust Act of 1983.

      f.     Order such equitable and injunctive relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct.

      g.     Enter judgment against Defendants, holding them jointly and severally liable for antitrust violations alleged herein.

      h.     Grant Plaintiffs all other legal damages, and such other and further relief, at law or in equity, to which Plaintiffs may show themselves justly entitled.

Dated: September 29, 2023                    Respectfully submitted,

                                             John T. Smithee, Jr.
                                             Texas Bar No. 24098449
                                             John.Smithee@uwlaw.com
                                             Autum L. Flores
                                             Texas Bar No. 24081205
                                             Autum.Flores@uwlaw.com
                                             Gabrielle Griffith
                                             Texas Bar No. 24108884
                                             Gabrielle.Griffith@uwlaw.com
                                             UNDERWOOD LAW FIRM, P.C.
                                             500 S. Taylor, Suite 1200
                                             Amarillo, Texas 79101
                                             Tel: (806) 376-5613
                                             Fax: (806) 379-0376

                        By:     */s/ John T. Smithee, Jr.*
                                John T. Smithee, Jr.

                                **Attorneys for Plaintiffs**

47