IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| OPEN CHEER & DANCE<br>CHAMPIONSHIP SERIES, LLC, *et al.*,<br><br>   Plaintiffs,<br><br>v.<br><br>VARSITY SPIRIT, LLC, *et al.*,<br><br>   Defendants. | 2:23-CV-0155-Z |

**MEMORANDUM OPINION AND ORDER**

  Before the Court is Defendant United States All Star Federation's ("USASF") Motion to Dismiss for Lack of Personal Jurisdiction ("USASF's Motion") (ECF No. 21), and Defendants' Joint Motion to Dismiss the Complaint ("Joint Motion") (ECF No. 24).[1] Having reviewed the briefing and relevant law, the Court **DENIES** both Motions.

  **BACKGROUND**

  This case concerns alleged antitrust violations by Defendants in the "All Star Cheer" market. ECF No. 1 at 2. Those violations, per Plaintiffs, include a "group boycott" and "anticompetitive and tortious tactics" used "to maintain [Defendants'] stranglehold over" the competition. *Id.* More specifically, Plaintiffs allege that Defendants used "exclusionary" contracts and established "sanctioning bodies" to prevent competitors from "gaining a foothold." *Id.* at 2–3.

  USASF individually responds that this Court lacks jurisdiction over it. ECF No. 22 at 8. And Defendants collectively respond with the Joint Motion, arguing that (1) their membership

---

[1] Plaintiff Open Cheer and Dance, LLC ("Open Cheer") hosts "the annual Allstar World Championship event in Orlando, Florida, where the world's top All Star Cheer teams compete for a championship in the sport." ECF No. 1 at 10. Defendant Varsity Spirit, LLC ("Varsity") hosts "All Star events and competitions throughout the United States." *Id.* at 11. Defendant USASF serves to "establish rules for sanctioning and providing governance for cheerleading" and has "promulgated . . . rules governing All Star Competitions and, more broadly, the sport of All Star Cheer." *Id.*

agreements are not *per se* illegal because they lack horizontal agreements among direct competitors; (2) Plaintiffs' reliance on alleged harm to gyms, consumers, and others is misplaced; and (3) Plaintiffs' state law claims fail for the same reasons as their federal ones. ECF No. 25 at 7–14.

### LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(6) "is viewed with disfavor and is rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference" that the defendant is liable. *Iqbal*, 556 U.S. at 678. "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.

"When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, it is the plaintiff's burden to establish that *in personam* jurisdiction exists." *Int'l Truck & Engine Corp. v. Quintana*, 259 F. Supp. 2d 553, 556 (N.D. Tex. 2003). That burden may be satisfied "by presenting a *prima facie* case that personal jurisdiction is proper" — *i.e.*, "proof by a preponderance of the evidence is not required." *Id.* "Any genuine, material conflicts between the facts" are "resolved in favor of plaintiff" in "determining whether a *prima facie* case exists." *Id.* Lastly, this Court "recognize[s] that evidence adduced" later "may mandate a different conclusion; however, *at this stage of the proceedings*, all that is required of [Plaintiffs] is to meet the low threshold of a *prima facie* showing." *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 869 (5th Cir. 2000) (emphasis added).

ANALYSIS

I.  **This Court has jurisdiction over USASF.**

Defendant USASF argues that "Plaintiffs' vague and inaccurate allegations are insufficient to establish personal jurisdiction." ECF No. 22 at 5. Specifically, it claims that "USASF is not an inhabitant of, cannot be found within, and does not transact business in the Northern District of Texas" — and is therefore not subject to personal jurisdiction under Section 12 of the Clayton Antitrust Act of 1914 ("Clayton Act"). *Id.* Nor, per USASF, does jurisdiction exist "under the Texas long-arm statute or constitutional due process." *Id.*

A. **Jurisdiction exists under the Clayton Act.**

Section 12 of the Clayton Act governs jurisdiction of Plaintiffs' federal antitrust claims. It reads:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. Section 22.

A circuit split exists as to whether clauses one and two are interdependent. *See KM Enterprises, Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 726–27 (7th Cir. 2013) ("The Third and Ninth Circuits hold that the Section's clauses may be decoupled . . . . [W]hile the D.C. and Second Circuits have adopted the integrated" view.). To date, the Fifth Circuit has not weighed in — but this District has. *See Management Insights, Inc. v. CIC Enterprises, Inc.*, 194 F. Supp. 2d 520, 530 (N.D. Tex. 2001) (holding that the "operation of the statute is predicated upon proper venue," thereby endorsing the interdependent view). This Court agrees. Accordingly, Plaintiffs must show that Defendants either (1) inhabit; (2) "may be found" in; or (3) "transact[] business" in this District. 15 U.S.C. Section 22.

In the instant case, Plaintiffs focus on the latter. They allege that USASF "quantifies its business activity in terms of member athletes, coaches, event producers, and sanctioned competitions" and

"sanction[s] numerous cheerleading competitions in Texas, hold[s] large conferences, and receiv[es] membership dues — [all of which] generate revenue." ECF No. 30 at 20–21. And they argue that "the USASF's Professional Responsibility Code provides a detailed list of rules" that "apply to sanctioned events, including owners and coaches." *Id.* at 22.

Those rules, per Plaintiffs, include "requiring all teams attending a USASF sanctioned event to have a roster and ensuring all components of the roster are correct;" enforcing "safety requirements for adult USASF members;" and "reporting any noncompliance by other . . . Members in attendance." *Id.* And Plaintiffs rely on caselaw for the proposition that "[n]ot-for-profit membership organizations transact business in the district in which their members reside" when the organization "exercises significant control over the activity of their members in the forum district." *Id.* at 21.

USASF's primary response — that "having members in Texas is insufficient to qualify as 'transacting business' under Section 12" — is predicated on *Golf City, Inc. v. Wilson Sporting Goods, Co.*, 555 F.2d 426, 436 (5th Cir. 1977). But that case is of limited relevance. First, the Fifth Circuit *expressly* limited its ruling to "the particular facts of this case as found by the district court in its venue opinion." *Id.* at 438. And the facts there, unlike here, involved for-profit entities selling tangible goods. Second, Defendants have *thousands* of members that reside in Texas — swamping the 55 present in *Golf City*. *Id.* at 437; ECF Nos. 1 at 23; 30 at 21. And in any event, the number of organization members present was only one of *four* factors considered in *Golf City*. Lastly, USASF's activities, unlike those in *Golf City*, appear vast, substantive, and continuous. ECF No. 30 at 7–12.

At this stage, Plaintiffs have established jurisdiction under the Clayton Act. The caselaw and pled facts — evaluated under the appropriate standard — both counsel that result. *See Myers v. Am. Dental Ass'n*, 695 F.2d 716, 727 (3d Cir. 1982) (holding that activity undertaken by professional dentists association to bring about acceptance of and compliance with its professional code of

ethics constituted transaction of business); *Courtesy Chevrolet, Inc. v. Tennessee Walking Horse Ass'n*, 344 F.2d 860, 865 (9th Cir. 1965) (finding that activity of an association's representatives in implementing licensing standards for the raising of horses was transacted business); *Sherman College of Straight Chiropractic v. Am. Chiropractic Ass'n*, 534 F. Supp. 438 (N.D. Ga. 1982) (holding that the sponsorship of three or four seminars to fulfill goal of maintaining high professional standards constituted transacting business under 15 U.S.C. Section 22).

### B. Jurisdiction exists under the Texas long-arm statute.

The Texas long-arm statute provides jurisdiction if a defendant is "doing business" within the state. *Mgmt. Insights, Inc.*, 194 F. Supp. at 524. A nonresident "does business" within the state if it: (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state; (2) commits a tort in whole or in part in this state; or (3) recruits Texas residents, directly or through an intermediary located in the state, for employment inside or outside the state. TEX. CIV. PRAC. & REM. CODE ANN. Section 17.042 (West).

Defendants fit that bill, per Plaintiffs, because (1) "USASF enters into thousands of written contracts with Texas residents every year, and these contracts are to be performed in Texas, including in this District;" (2) "a substantial portion of the antitrust injury" that "forms the basis of this lawsuit occurred in Texas because the primary targets of Defendants' group boycott" are "headquartered in Amarillo, Texas," and "USASF also sent correspondence in the pursuit of its antitrust activities to Redline Cheer and Dance in Amarillo, Texas;" and (3) "USASF employs multiple Texas residents that regularly perform work for USASF within Texas." ECF No. 30 at 14. At this stage of litigation, the Court agrees.

"[T]he sole inquiry that remains," then, is "whether personal jurisdiction offends or comports with federal constitutional guarantees." *Williams v. Licari*, No. 4:22-CV-5-ALM-KPJ, 2023 WL

6048774, at *4 (E.D. Tex. Sept. 14, 2023). Those guarantees permit exercising personal jurisdiction over a nonresident defendant so long as doing so does not offend "traditional notions of 'fair play and substantial justice'" and the defendant has "minimum contacts" with the forum. *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). "Minimum contacts" can be illustrated via (1) "acts specific to the instant suit," or (2) "transactions . . . of such a 'continuous and systematic' nature as to be 'sufficient to allow a court to assert jurisdiction over the party in the particular case.'" *Mgmt. Insights, Inc.*, 194 F. Supp. 2d at 525.

Here, Plaintiffs aver that "USASF has entered into written membership agreements with numerous event producers in the state of Texas" and that those membership agreements "form[ed] the basis for Plaintiffs' claims in this lawsuit" — namely, because they "contain[ed] explicit language by which USASF and the event producers agree[d] to engage in a group boycott" of the Plaintiffs. ECF No. 30 at 16. And Plaintiffs point to "a [USASF] warning letter to [Amarillo-based] Redline Cheer and Dance, which is an event production company owned by . . . one of the owners of Open Series and Open Cheer." *Id.* at 15. That letter "not only warned Redline of its supposed noncompliance with USASF's membership agreement," but also "went beyond the language of that membership agreement by asking Redline and [its owner] to agree to no longer 'affiliate' with the All Star World Championship." *Id.* Thus, Plaintiffs conclude, "USASF itself engaged in a purposeful forum-directed activity that gives rise to specific personal jurisdiction over USASF in this case." *Id.* at 16.

The foregoing is sufficient to establish specific jurisdiction at this stage. Indeed, the Fifth Circuit has already found sufficient — for specific jurisdiction — the mailing of a single letter. *See SGS-Thomson Micro-Elecs., Inc. v. Ferris*, 55 F.3d 632 (5th Cir. 1995) (affirming the district court's judgment that a letter "accusing Plaintiff of certain violations" satisfied the "minimum contacts" and "substantial justice" tests). And because Plaintiffs adequately pled that USASF's

"precise activities within the State of Texas" formed "the basis of Plaintiffs' claims," their arguments concerning general jurisdiction require no analysis.

## II. Plaintiffs' federal antitrust claims do not fail as a matter of law.

The Sherman Antitrust Act of 1890 ("Sherman Act") prohibits all agreements that restrain trade. *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 373 (5th Cir. 2014). Its "central message" is that "a business entity must find new customers and higher profits through internal expansion — that is, by competing successfully rather than by arranging treaties with its competitors." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600 (1985). To establish a violation, Plaintiffs must demonstrate that (1) Defendants engaged in a conspiracy; (2) the conspiracy had the effect of restraining trade; and (3) trade was restrained in the relevant market. *Id.* Defendants challenge only (1) and (2). ECF No. 25 at 9–11.

### A. Plaintiffs plausibly allege conspiracy.

"To satisfy the conspiracy element of a Sherman Act claim, [Plaintiffs] must show 'that [Defendants] engaged in concerted action, defined as having "a conscious commitment to a common scheme designed to achieve an unlawful objective."'" *Marucci Sports, L.L.C.*, 751 F.3d at 373 (quoting *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008)). Here, Plaintiffs allege that the written membership agreements, "which contain the explicit anticompetitive language about which Plaintiffs complain," are "direct evidence of concerted action between Varsity, USASF, and other USASF event producers" because "all these entities are signatories to those agreements." ECF No. 29 at 10.

Those membership agreements — which USASF "requires all . . . its event producer members" to sign — provide that "all USASF Member Event Producers for the 22–23 season will be prohibited from directly or indirectly being affiliated with any year-end multi-brand event that is: (a) not USASF

Sanctioned; [or] (b) a cheerleading or dance World championship event conducted by a third party."[2] ECF No. 1 at 32. They order event producers to "avoid working with those that do not support the USASF's mission," and warn that doing so "is grounds for revocation of the Company's membership, at the sole discretion of the USASF." *Id.* at 33. And they require "all USASF event producers to impose the same requirements on their Worlds Bids recipients." *Id.*

Plaintiffs "should present direct or circumstantial evidence that reasonably tends to prove that [Defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal marks omitted). They have done so here. But in any event, Plaintiffs have alleged facts indicating that Defendants "reached an agreement with one another that each of them may host or produce a world championship but that they will act against any other competitor that tries to do the same."[3] ECF No. 29 at 11. And those facts plausibly establish concerted action.

However, as to non-signatory Defendants International Cheer Union ("ICU") and International All Star Federation ("IASF"), "Plaintiffs rely on indirect evidence to establish a conspiracy." *Id.* at 10. As for the ICU, that indirect evidence is — in summary fashion — that (1) "Varsity . . . helped create the ICU to act as another 'governing body;'" (2) "[t]he President of the ICU is Jeff Webb, the founder of Varsity;" (3) "the ICU receives a share of USASF's revenue;" (4) "[t]he ICU World Championship is a competing event of the Cheerleading World Championship in the All Star Competition Market;" and (5) "because of USASF's members'

---

[2] Currently, "only one All Star world championship meets this description: the Allstar World Championship." ECF No. 1 at 33.

[3] "Defendant Varsity has also plotted with Defendant USASF to try to prevent any other competitor from hosting a 'world' championship. Defendant Varsity purportedly assigned its rights to certain trademarks for the phrase 'The Cheerleading Worlds' to Defendant USASF, and then Defendant USASF quickly filed a lawsuit trying to prevent the Open Series and Open Cheer from using the word 'world' in the name of their events. Defendant USASF has not made any similar complaints against IASF or ICU for describing their All Star competitions as 'world' championships. The Open Series and Open Cheer are being targeted because their new championship events threaten Defendants' control of the market." ECF No. 1 at 7–8.

agreement, most consumers can only attend 'world' championship events that have been sanctioned by USASF[,] []which include . . . the ICU World Cheerleading Championships . . . , resulting in Defendants being able to raise" the price. ECF No. 1 at 23–41.

As for the IASF, Plaintiffs argue that (1) the "IASF has promulgated or enforced rules governing All Star Competitions;" (2) "[t]he USASF and IASF determine which event producers get to offer bids to the championship events they co-host;" (3) the USASF and IASF "have (a) used anticompetitive rules and standards to stop other event producers from putting on a rival non-Varsity championship competition and (b) coerced members . . . to cease doing business with Varsity's competitors;" and (4) the IASF has "threatened to punish an event producer if it continues to remain a member of the Open Series and a[] . . . partner of Open Cheer." *Id.* at 3–11.

In sum, Plaintiffs "rely on circumstantial evidence to prove the existence of a conspiracy" and have "proffer[ed] sufficient evidence to permit the inference of an antitrust conspiracy" as to the non-signatory Defendants. *Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383, 392 (5th Cir. 1996); *MVConnect, LLC v. Recovery Database Network, Inc.*, No. 3:10-CV-1948, 2011 WL 13128799, at *5 (N.D. Tex. May 27, 2011). Hence, their claims survive this stage of litigation.

### B. Plaintiffs plausibly allege an anticompetitive effect.

"We assess whether a combination restrains trade unreasonably by use of the rule of reason, weighing all the circumstances of the case . . . unless the combination falls within one of the categories of *per se* unreasonableness — conduct so pernicious and devoid of redeeming virtue that it is condemned without inquiry into the effect on the market in the particular case at hand." *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 222–23 (5th Cir. 2001) (internal marks omitted); *see In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 532 (N.D. Tex. 2014). At this stage, Plaintiffs pass either test.

First, *per se*: Group boycotts are *per se* illegal if they involve "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985). Defendants argue that the USASF membership agreements are "vertical agreements between event producers and USASF," *not* horizontal agreements — a necessary element to a boycott conspiracy claim. ECF No. 25 at 12. Plaintiffs respond that USASF "prohibiting its members from directly or indirectly associating" with "any other person or entity who produces a world championship event" — and then requiring *those* members "to enforce this same requirement on the members' own customers" — certainly constitutes a horizontal conspiracy. ECF No. 29 at 12.

At this stage, Plaintiffs successfully plead a *per se* violation of the Sherman Act. The facts alleged — evaluated in light of the appropriate standard — plausibly show that Defendants "have engaged in a group boycott" by "conspiring together" to (1) "prohibit any of USASF's members from 'directly or indirectly being affiliated with' another world championship event;" (2) "require USASF's members to boycott any person or entity in the all star industry that is not a USASF member (including Plaintiffs);" (3) "require all USASF member event producers to impose these same requirements on the gyms that receive bids to the Defendants' world championship events;" and (4) "prohibit athletes, coaches, judges, and officials from participating in any way in any world championship event not produced or sanctioned by the Defendants." *Id.* at 13.

Defendants' remaining counterargument — that any restraints alleged here actually help Plaintiffs — is untenable. *See* ECF No. 25 at 18 ("Even if Plaintiffs could prove those allegations, the harms they allege would only weaken Defendants as competitors and give Plaintiffs heightened opportunities to reap the benefit."). Such arguments conflict with "the basic policy of the Sherman

Act," *Nat'l Soc. of Pro. Engineers v. United States*, 435 U.S. 679, 695 (1978), because "sparing consumers the need to patronize competing firms is not a procompetitive justification for a group boycott," *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 836 (9th Cir. 2022).

Second, the rule of reason: "[T]he distinction between boycotts that are *per se* illegal and those judged by the rule of reason is often a vexing one." *Spectators' Commc'n Network Inc.*, 253 F.3d at 223. But in any event, "most antitrust claims are analyzed under a 'rule of reason,'" according to which the finder of fact "must decide whether the questioned practice imposes an unreasonable restraint on competition[.]" *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). In doing so, he must consider "a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Id.* As the analysis *supra* illustrates, Plaintiffs satisfy this test as well. *See supra* Part II(A); (B).

### III. Plaintiff Deep South Cheer, Inc., should not be dismissed.

Defendants argue that Plaintiff Deep South Cheer, Inc., ("Deep South") "fails to state sufficient facts in support of any cause of action." ECF No. 25 at 20. And specifically, per Defendants, it "has failed to state any plausible facts that would demonstrate a group boycott." *Id.* Plaintiffs respond that their complaint "makes clear that Defendants' boycott extends to all event producers that are *indirectly or directly affiliated or associated* with the Allstar World Championship." ECF No. 29 at 22 (emphasis in original). And Deep South "is an event producer that produces qualifying events and awards bids to the Allstar World Championship." *Id.*

The Court agrees with Plaintiffs. As evidenced by the pleadings, "Deep South has asserted a *concerted* refusal to deal, not the type of unilateral refusal to deal that is addressed in the case cited by Defendants in their Brief." *Id.*; ECF No. 1 at 40. And the Supreme Court "has long held

that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of [Section] 1 of the Sherman Act." *Nw. Wholesale Stationers, Inc.*, 472 U.S. at 290; *Am. Airlines, Inc. v. Travelport Ltd.*, No. 4:11-CV-244-Y, 2012 WL 3737037, at *7 (N.D. Tex. Aug. 7, 2012).

### IV.     Plaintiffs' state antitrust claims do not fail as a matter of law.

Lastly, Defendants argue that Plaintiffs seek to bootstrap the same facts "into claims under Texas law" — claims that fail "for the same reasons their federal antitrust claims fail." ECF No. 25 at 19. But here, Plaintiffs' federal claims have survived the motion to dismiss stage. Accordingly, their state claims do too. *See Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 325 n.1 (5th Cir. 2015) ("Because the Texas Free Enterprise and Antitrust Act utilizes the same standards as the Sherman Act for establishing a violation, the Sherman Act analysis applies to Plaintiffs' state law claims as well."); *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 601 (S.D. Tex. 2022).

### CONCLUSION

For the foregoing reasons, USASF's Motion and Defendants' Joint Motion are **DENIED**.

**SO ORDERED**.

March 21, 2024

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE