IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| OPEN CHEER & DANCE CHAMPIONSHIP SERIES LLC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>VARSITY SPIRIT, LLC, *et al.*,<br><br>Defendants. | | 2:23-CV-155-Z |

**MEMORANDUM OPINION AND ORDER**

Before the Court are two motions to exclude expert testimony, both filed by Defendants on December 1, 2025. In the first motion to exclude, Defendants move to exclude the expert testimony of Plaintiffs' proffered expert Stefan Szymanski ("Szymanski Motion"). ECF No. 211. In the second, Defendants move to exclude the expert testimony of Plaintiffs' proffered expert Pierre Thomas Léger ("Léger Motion").[1] ECF No. 216.

For the following reasons, the Court **GRANTS** in part and **DENIES** in part both the Szymanski Motion and the Léger Motion.

---

[1] Plaintiffs filed their own Motion to Exclude the Expert Report and Expert Testimony of Defendant's Expert Kevin Murphy on August 14, 2025. ECF No. 174. The Court directed the Clerk of Court to return unfiled that motion and several others due to the parties' repeated failure to satisfactorily confer before filing discovery motions. ECF No. 202 at 1–2 (noting that the parties had filed twenty-three separate discovery disputes as of October 27, 2025). The parties then jointly moved to extend the deadline for motions to exclude to December 1, 2025. ECF No. 205 at 3. The Court granted that motion. ECF Nos. 209, 210. Defendants then timely filed two renewed motions to exclude. Plaintiffs did not.

Months later, Plaintiffs filed a Motion in Limine to Exclude the Expert Testimony of Kevin Murphy. ECF No. 294. This violates the scheduling order governing this case, which provides that "[p]arties may not raise an issue in a motion in limine in an effort to obtain a substantive ruling that should have been requested in advance of trial by appropriate motion." ECF No. 273 at 12.

LEGAL STANDARD

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702.

To be admissible, expert testimony must meet all four subparts of Rule 702. *See El Aguila Food Prods., Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 619 (S.D. Tex. 2003), *aff'd*, 131 F. App'x 450 (5th Cir. 2005) ("*Daubert* and its progeny require that opinion testimony meet every requirement of Rule 702 . . . ." (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993))). "The party proffering expert testimony has the burden of establishing by a preponderance of the evidence that the challenged expert testimony is admissible." *Guzman v. State Farm Lloyds*, 456 F. Supp. 3d 846, 852 (S.D. Tex. 2020) (quoting *Gamboa v. Centrifugal Casting Mach. Co.*, No. CV 14-1273, 2015 WL 9948807, at *2 (S.D. Tex. May 15, 2015)).

Trial courts must act as a gatekeeper under Rule 702, "evaluat[ing] the foundation of an expert's testimony to ensure that 'the proffered evidence is both reliable and relevant.'" *Guzman*, 456 F. Supp. 3d at 852 (quoting *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007)); *see also VeroBlue Farms USA Inc. v. Wulf*, No. 3:19-CV-764, 2023 WL 348963, at *11 (N.D. Tex. Jan. 20, 2023) ("The party offering the expert testimony must show

2

that a qualified expert's testimony is relevant (that is, the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, and the expert's reasoning or methodology properly can be applied to the facts in issue) and reliable (that is, the testimony is based on sufficient facts or data and is the product of reliable principles and methods)." (citation modified)); *Hall Arts Ctr. Off., LLC v. Hanover Ins. Co.*, 327 F. Supp. 3d 979, 1001 (N.D. Tex. 2018) (Fitzwater, J.) ("The court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999))). "An expert's opinion is considered reliable if the reasoning or methodology underlying the testimony is scientifically valid." *Guzman*, 456 F. Supp. 3d at 852 (citation omitted). "Relevance depends upon whether that reasoning or methodology properly can be applied to the facts in issue." *Id.*

Courts look to several factors to determine whether expert testimony is reliable, including:

> whether the expert's opinion was developed for purposes outside of litigation; whether there is an analytical link connecting the case facts with the expert's opinion; whether the expert "adequately accounted for obvious alternative explanations"; whether the expert used the same level of intellectual rigor that would be used in the field; and whether the expert's field of expertise is known to be reliable for the relevant type of opinion.

*Guzman*, 456 F. Supp. 3d at 852 (citing FED. R. EVID. 702 advisory committee's note to 2000 amendment); *see also Daubert*, 509 U.S. at 593–94 (listing factors such as whether the expert's methodology can be tested, whether it has been peer-reviewed, and the degree of acceptance of the expert's methods within the relevant expert community). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying

3

the expert's opinion, [and] the link between the facts and the conclusion." *Id.* (quoting *Seaman v. Seacor Marine LLC*, 326 F. App'x 721, 725 (5th Cir. 2009)).

This does not mean that the district court's "gatekeeper function" replaces "the traditional adversary system or the role of the jury within this system." *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 166 F. Supp. 3d 654, 662 (E.D. La. 2016) (citing *Daubert*, 509 U.S. at 596). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain "the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "Nonetheless, expert testimony 'must be reliable at each and every step or else it is inadmissible.'" *Pool Prods.*, 166 F. Supp. 3d at 662 (quoting *Kirby Inland*, 482 F.3d at 355).

The second inquiry is into whether the expert's reasoning or methodology is relevant to the underlying litigation. "The question here is whether the reasoning or methodology 'fits' the facts of the case and will thereby assist the trier of fact to understand the evidence." *Pool Prods.*, 166 F. Supp. 3d at 662. "'Fundamentally unsupported' opinions 'offer no expert assistance to the jury' and should be excluded." *Id.* (quoting *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005)). "A district court has considerable discretion to admit or exclude [irrelevant] expert testimony under Rule 702." *Id.* at 661 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138–39 (1997)).

Lastly, in 2023, Rule 702 was "amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." FED. R. EVID. 702 advisory committee's notes to 2023 amendment. This amendment spoke to "the preponderance of the evidence standard that applies to most of the admissibility requirements set forth in the evidence rules," which remains unchanged. *Id.*

But the 2023 amendment specifically rebuked lower-court decisions holding "that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility" as "an incorrect application of Rules 702 and 104(a)." *Id.* Thus, it is now firmly within the trial court's gatekeeping function to exclude expert testimony that lacks a sufficient grounding in a reliable methodology. And it is for the court, not the jury, to decide whether an expert's opinion reflects a reliable application of his methodology to the facts of the case.

ANALYSIS

I.    Szymanski Motion

Defendants challenge each of Dr. Szymanski's seven opinions on reliability and relevance grounds. As summarized by Defendants, these opinions are:

> First, [Szymanski] opines about what each of the Sanctioning Organization[s'] "legitimate purpose" was. His second opinion is that "Varsity worked to undermine the [Sanctioning Organizations'] independence." Third, he opines that the Sanctioning Organizations' "governance structure . . . helped Varsity to influence their decisionmaking and encouraged the [Sanctioning Organizations] to coordinate with Varsity." Fourth, he opines that "the [Sanctioning Organizations'] rules facilitated Varsity's dominance of All Star Cheer." Fifth, he opines that "[t]he [Sanctioning Organizations] worked with Varsity to refrain from sanctioning an end-of-season event for lower-level Teams (i.e., Allstar World Championship) that would have competed with Varsity's The Summit, The D2 Summit, The Youth Summit, and U.S. Finals." Sixth, he prophesizes that "[w]ithout Varsity's interference, the [Sanctioning Organizations] would have been structured and behaved differently, promoting athletic and economic competition and taking measures to limit Varsity's dominance of All Star Cheer." Seventh, he opines that "[t]he failure of the [Sanctioning Organizations] to promote athletic and economic competition would be expected to have anticompetitive economic effects."

ECF No. 213 at 8 (citations omitted).[2]

Stefan Szymanski is "one of the world's leading sports economists and a professor of Sport Management at the University of Michigan." ECF No. 231 at 7. He "received an M.A. from the

---

[2] Defendants use the term "Sanctioning Organizations" to collectively refer to the U.S. All Star Federation ("USASF"), the International All Star Foundation ("IASF"), and the International Cheer Union ("ICU"). *See* ECF No. 213 at 7.

University of Oxford in Politics, Philosophy and Economics, and an M.Sc. and Ph.D. in Economics from London University." *Id.* He is "the most cited sports economist globally," has "authored 12 books[,]" and has "published over 100 peer-reviewed articles." *Id.* "His professional experience includes testifying for both the U.S. and U.K. governments on difficult issues in cases involving sports." *Id.* at 7–8.

Defendants do not argue that Dr. Szymanski is unqualified to testify as an expert, so they have waived this "initial question under Rule 702." *United States v. Chapman*, 839 F.3d 1232, 1238 (10th Cir. 2016) ("An initial question under Rule 702 is whether the proffered expert is qualified to testify on the topic for which her testimony is offered." (citation omitted)). The Court thus finds that Szymanski meets the low threshold for qualification as an expert. *See Thomas v. Deloitte Consulting LP*, No. 3-02-CV-343, 2004 WL 5499955, at *3 (N.D. Tex. Nov. 30, 2004) (describing the qualification inquiry as a "relatively low threshold" for the proponent to clear (citing *Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999))).

### A. The Sanctioning Bodies' Purpose

Defendants first argue that Szymanski's proposed expert opinion on the "Sanctioning Organizations[] 'legitimate purpose'" is "not based on any revealed methodology and is largely a factual narrative and thus inadmissible." ECF No. 213 at 21. Specifically, they contend that Szymanski is wrong to suggest a similarity between the Sanctioning Organizations and "National Governing Bodies" in the Ted Stevens Olympic and Amateur Sports Act. *Id.* (citing 36 U.S.C. § 220501 *et seq.*). His opinion, they contend, is "at best a mere untested hypothesis, and should not be admitted." *Id.* at 23.

But Szymanski's proposed expert testimony is not that USASF and the other Sanctioning Organizations *are* "National Governing Bodies" under the Ted Stevens Act. Rather, he would testify that those entities are analogous to the Sanctioning Organizations, in that both perform

6

similar functions. As Plaintiffs note, "[s]imply because the USASF is not designated as a national governing body for selecting Olympic representatives ... does not mean that there is no comparison to be made." ECF No. 231 at 14. As Plaintiffs also explain, the "comparison [to National Governing Bodies] is not the entire basis for his opinions," as he also "explain[s] that another analogy is a standard-setting trade association." *Id.* at 14–15. The Court agrees with Plaintiffs that this comparison is the product of "specialized expertise and knowledge in sports economics" beyond the "ordinary understanding of a lay person" that will assist the jury in understanding this case's facts. *Id.* at 8.

This comparison between the Sanctioning Organizations—USASF, IASF, and ICU—and other National Governing Bodies will assist the jury in drawing parallels between how these kinds of organizations behave in different industries. This makes it relevant under *Daubert*. And importantly, it is the product of Szymanski's robust experience and not simply a repackaging of Plaintiffs' view of the case under the guise of expert testimony.

"[E]vidence should be excluded prior to trial only if it is clearly inadmissible for any purpose." *Douglas v. Potter Cnty., Tex.*, No. 2:24-CV-030, 2025 WL 824582, at *6 (N.D. Tex. Mar. 13, 2025) (Kacsmaryk, J.) (quoting *Child.'s Med. Ctr. Dall. v. Columbia Hosp. Med. City Dall. Subsidiary, L.P.*, No. 3-04-CV-2436, 2006 WL 616000, at *4 (N.D. Tex. Mar. 10, 2006)). Szymanski's first opinion is reliable and relevant, so Plaintiffs may present it at trial.

### B. *Varsity's Alleged Efforts to Undermine the Sanctioning Bodies' Independence*

However, Szymanski's second opinion must be excluded. Here Szymanski opines that "Varsity worked to undermine the governing bodies' independence from the outset of their existence," stating that "[t]he evidence I have reviewed makes clear that [the governing bodies] did not fulfill its mission as an independent governing body or authority because Varsity undermined [their] independence from its formation." ECF No. 213 at 23 (citing Szymanski Report at A18). This is different than offering an objective assessment of how entities like the

Sanctioning Organizations normally operate, as Szymanski does in his first opinion. Instead, his second opinion would go a step further and offer his own view of whether the Sanctioning Organizations fulfilled their mission.

As Defendants note, "[t]hese are all factual assertions, which ignore a large part of the evidentiary record, and the jury does not need Dr. Szymanski to summarize [those facts] for it." *Id.* at 24. Plaintiffs further offer no reason why an *expert* must present this theory of the case rather than a lay witness. So while Plaintiffs may certainly advance this theory at trial by other means, this is not the proper role of expert testimony under Rule 702.

### C. *The Sanctioning Organizations' Governance Structure and Rules*

Defendants challenge Szymanski's third and fourth opinions together because both relate to the Sanctioning Organizations' "governance structure and rules." ECF No. 213 at 24. Defendants argue that "[t]he gist of his opinions in these areas are that Varsity exerted what he calls 'inappropriate influence over USASF' and that other Governing Bodies gave Varsity 'favorable treatment.'" *Id.*

Defendants rightly note that Szymanski's use of terms like "inappropriate" and "favorable" risk confusing the jury. *Id.* at 25. Simply offering his own spin on whether Varsity exerted "inappropriate" influence over the Sanctioning Organizations fails to meet Rule 702's relevance standard because such assertions will not "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a). And, as Defendants point out, such loaded terms are excludable under Rule 403 even if they are relevant under Rule 702. *See* FED. R. EVID. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). Even where the Court has allowed Szymanski to present a given opinion, he must at all times avoid employing

normative terms such as "inappropriate" or "disfavored." Whether Defendants' conduct is any of those things is for the jury alone to decide.

However, Szymanski's opinions about Varsity's and the Sanctioning Organizations' governance structure and internal rules may be admitted. Here, the line between admissible and inadmissible is simple: Szymanski may offer his understanding of how Varsity and the Sanctioning Organizations work. He may compare those organizations to similar entities in other industries, as he proposes to do in his first opinion. But he may not go a step further and add terms like "appropriate" or "inappropriate." It is for the jury to decide whether Defendants' conduct was appropriate and legal, not for Plaintiffs' expert witness.

### D. Varsity and USASF's Relationship in 2016

Plaintiffs also propose offering Szymanski's expert testimony about Varsity and USASF allegedly "work[ing] together" in 2016. ECF No. 213 at 26. Specifically, Szymanski would testify that "USASF 'improperly' decided not to offer a lower-level end-of-season event that would compete against Varsity's and its other event producer members' lower-level end-of-season events." *Id.* Defendants label this Dr. Szymanski's fifth expert opinion.

This opinion must be excluded in its entirety. As Defendants correctly note, Plaintiffs are simply "putting forth Plaintiffs' version of facts" through an expert witness. *Id.* Dr. Szymanski's testimony on this point would not add anything that could come into evidence only via an expert witness; anyone could testify about this alleged relationship between USASF and Varsity. Further, as Defendants also point out, Dr. Szymanski offers no methodology for how he arrived at this conclusion besides his own experience. But anyone could reach the same conclusions, expert or not. Szymanski's fifth opinion is therefore excluded in its entirety.

### E. Speculation About What Would Have Happened "Without Varsity's Interference"

Szymanski's sixth proposed expert opinion is about "what the Sanctioning Organizations might have done differently absent Varsity's 'regulatory capture.'" ECF No. 213 at 27. This is pure speculation and must be excluded. Szymanski could testify, as already noted above, about how organizations in other industries typically behave absent the "regulatory capture" that is the focus of much of his expert report. But he may not simply argue that "but-for alleged conduct X by Varsity, then Y would have resulted." That is for the jury to infer on its own, not for an expert witness to tell them.

### F. The "Expected Economic Effects" of USASF's Conduct

Defendants move to exclude Szymanski's seventh and final expert opinion, in which Szymanski opines that "'the USASF's, IASF's and ICU's complicity in Varsity's dominance over All Star Cheer would have been expected to have various anticompetitive effects' because it is 'the kind of conduct that would be capable of causing, and expected to cause, these sorts of anticompetitive effects.'" ECF No. 213 at 29 (citations omitted). Defendants argue that this testimony is inadmissible because it is "a partisan statement with no analysis or support, more akin to an untested hypothesis than a reasoned, reliable expert opinion." *Id.*

The Court disagrees. This opinion could assist the jury in connecting Varsity's "dominance" over All Star Cheer with the kind of anticompetitive fallout an expert like Szymanski would expect to result from an alleged antitrust violation. That Szymanski does "not express an opinion about whether [the relationship] in fact did have these effects" is immaterial. ECF No. 213 at 29. The point is that his testimony will help the jury understand what might be expected to result from an antitrust violation. Whether such a violation has in fact occurred here is for the jury to decide, but Szymanski's seventh opinion may help them understand what an illegally integrated industry might look like.

## II.    Léger Motion

Plaintiffs' second proposed expert witness is Pierre Thomas Léger. Léger is employed as a health care economist. ECF No. 217-1 at 6. Neither party describes his professional background in greater detail than that. Plaintiffs say "Léger has developed particular skills, experience, and specialized knowledge . . . [d]ue to his extensive education, research, and overall experience"; Defendants say he "is a health care economist with no prior experience in matters related to sports." ECF No. 232 at 7; ECF No. 217-1 at 6.

Plaintiffs offer Léger "as a potential expert on market definition, market power, harm to competition, harm to Plaintiffs, and damages." ECF No. 217-1 at 6. As with the Szymanski Motion, Defendants do not challenge Léger's expert qualifications. And as with the Szymanski Motion, the Court will address each of Defendants' arguments in the Léger Motion in turn.

### A.  Léger's Market Definition Opinion

Rule-of-reason analysis generally requires antitrust plaintiffs to define the relevant market. *See Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002). "The two components of the relevant market are (1) the product market and (2) the geographic market." *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1036–37 (5th Cir. 2023) (citing *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453–54 (5th Cir. 2021)). "A legally cognizable product market must 'include all commodities reasonably interchangeable by consumers for the same purposes.'" *Id.* at 1037. "A district court can dismiss Sherman Act claims for failure to properly define the relevant market." *Id.* (citing *Apani*, 300 F.3d at 628).

### 1.  The Relevant Product Market

Léger opines that "the relevant product market is 'no wider than All Star Cheer Competitions.'" ECF No. 217-1 at 8 (citation omitted). He also opines that the relevant geographic market is "no broader than" the "entire U.S." *Id.* He bases his market-definition opinion on two

11

methodologies, or "tests": the "Hypothetical Monopolist Test ('HMT')" and the "SSNIP" Test.[3] These tests are among the "classical measures of market definition and market power." *Endure Indus.*, 164 F.4th at 412.

Defendants argue that Léger did not "start with the narrowest set of products or services (or geographic market) and only expand as needed," ignoring "the prospect of potentially narrower markets than the 'All Star Cheerleading [c]ompetitions' market with which he started." ECF No. 217-1 at 9. According to Defendants, he "likewise did no real analysis to exclude other products from the market but instead drew broad conclusions from anecdotal evidence with no quantitative analysis." *Id.* "This is a misapplication of the SSNIP test," they argue, "because (1) the 'candidate market,' *i.e.*, *all* All Star Cheerleading competitions, is not the narrowest possible product market for competitions; and (2) [Léger failed to consider] potentially broader markets, which might include other forms of cheerleading, other youth sports, and other youth activities." *Id.* at 9–10. The upshot of this argument is that Léger used unreliable methods and/or unreliably applied his methods to the facts of this case. If Defendants are correct, then Léger's market-definition opinion must be excluded under Rule 702(b)–(d).

Plaintiffs respond that Léger "performed an analysis of what products are reasonably interchangeable with one another by looking at demand-side substitutability." ECF No. 232 at 11. He also *did* "assess[] whether a hypothetical monopolist could profitably raise prices by 5-10% without losing significant demand to substitutes," as the SSNIP Test requires. *Id.* Plaintiffs also contend that Léger was not "mandated by the SSNIP test to start with the 'narrowest set of

---

[3] While Plaintiffs do not define the SSNIP Test or discuss how it works, the SSNIP Test asks "whether a hypothetical profit-maximizing firm . . . likely would undertake at least a small but significant and nontransitory increase in price 'SSNIP' or other worsening of terms" to "evaluate[] whether a group of products is sufficiently broad to constitute a relevant antitrust market." *Endure Indus., Inc. v. Vizient Inc.*, 164 F.4th 405, 412 n.2 (5th Cir. 2026) (Smith, J.) (citation omitted). "SSNIP generally looks for a 5% price increase, but it incorporates cross-price elasticity and a diversion ratio (also calculated by cross-price elasticity) into its measure, so it is really a mapping of elasticities onto profit margins." *Id.*

products,'" as Defendants argue. *Id.* Instead, SSNIP and the "hypothetical monopolist test ensure[] that markets are not defined too narrowly." *Id.* "The reason the HMT begins with and expands from a small product market is that starting with a market that is defined too broadly may understate the market power of the relevant firm." *Id.*

The Court finds that Léger's market-definition opinion is sufficiently relevant and reliable to survive scrutiny under *Daubert*. The question is not whether Léger applied the SSNIP or HMT tests in precisely the way *Defendants* or their experts would have. It is whether the technique he used is generally accepted within the relevant community—here, economics—and falsifiable in the event he applied the technique incorrectly. *See Nikolova v. Univ. of Tex. at Aus.*, 585 F. Supp. 3d 936, 940 (W.D. Tex. 2022), *modified in part*, No. 1:19-CV-877, 2022 WL 22830489 (W.D. Tex. Mar. 3, 2022) ("Trial courts ordinarily apply four factors when considering the reliability of scientific evidence: (1) whether the technique can be or has been tested; (2) whether it has been subjected to peer review or publication; (3) whether there is a known or potential rate of error; and (4) whether the relevant scientific community generally accepts the technique."). "This test of reliability is flexible, and these factors 'neither necessarily nor exclusively apply to all experts or in every case.'" *Id.* (quoting *Kumho Tire*, 526 U.S. at 141). SSNIP and HMT are unquestionably widely accepted in economics, as Defendants admit by attacking the *way* Léger applied those tests rather than the tests themselves. Nor do Defendants argue that Léger applied these tests in a way that radically departs from the norm within economics. It simply does not matter under *Daubert* whether Léger applied a broadly accepted methodology in a slightly different way than Defendants would have liked.

## 2. The Relevant Geographic Market

Léger next identifies the relevant geographic market as the entire United States. Defendants argue that he "posts [*sic*] two possibilities ('national' and 'regional') without choosing

13

one," but this is not the Court's understanding of his expert report. His primary conclusion seems to be that the relevant market is national, and to whatever extent he suggests the market may be regional, that is a fallback conclusion. For example, he writes:

> There are multiple types of evidence suggesting the relevant geographic market is the entire U.S., including: travel patterns of teams throughout the All Star Cheer Competition season; there are no differences between competitions held in different regions; there are no restrictions on where teams can and cannot compete; and Varsity documents directly stating that event producers compete over the entire U.S.

ECF No. 217-2 at 64–65. He then examines each of these points in detail over the next several pages. And Defendants' other arguments only underscore the fact that his market-definition opinion is that the relevant market is national. Léger devotes nearly a dozen pages to a discussion of a nationwide geographic market, but "[a]s to the possibility of 'regional' markets, Léger does not even specify what these regions are." ECF No. 217-1 at 13; *see also id.* ("All of his (albeit hopelessly flawed) market power analysis was undertaken on a *national* basis.").

Defendants also criticize Léger's report on the grounds that he allegedly employs "no quantitative analysis" to "support his 'national market'" definition. ECF No. 217-1 at 12. But he does, as Plaintiffs correctly note. Léger's "approach integrates qualitative and quantitative evidence" to argue for a nationwide market. ECF No. 232 at 14; *see also, e.g.*, ECF No. 217-2 at 248–50 (quantitatively analyzing maximum travel distances for 2018–19 season bid events).

Defendants' final objection to Léger's market-definition opinion is that "[g]eographic market definition is particularly important because of Deep South," which "does not conduct competitions around the country. It claims damages as to just two events, both of which are held in Alabama. If the relevant geographic markets are regional," then "whether any Defendant has 'market power' in whatever 'region' contains Alabama would be highly relevant. Léger, however, does not identify the geographies of his 'regions' or analyze market power in any region." ECF No. 217-1 at 13. As already noted, it is not clear that Léger argues for a regional geographic market

14

at all, and these alleged deficiencies in his analysis only underscore that point. But regardless, Deep South is one of three plaintiffs in this case. The fact that Deep South claims damages only as to two events held in Alabama does not mean that the other plaintiffs do, too.

### B. Léger's Market Power Opinion

Léger also opines that there is both direct and indirect evidence of Defendants' power over the All Star cheerleading market. As to direct evidence, Defendants argue Léger's testimony should be excluded because it both opines that "Varsity has the power to raise marketwide prices or reduce marketwide output" without further elaboration and "argues that Varsity's consolidation of its own events suggests market power." ECF No. 217-1 at 14. As to the second point, it is helpful to quote from Léger's report directly and at length:

> Varsity established a number of sanctioning bodies, including all its co-Defendants, over which it exercised substantial control. Plaintiffs allege that Varsity and its co-Defendants agreed to establish and enforce certain rules that require event producer members of the USASF and IASF (including both Defendants and non-Defendant IEPs and gyms) to boycott Plaintiffs and other non-USASF members, as explained below. . . .
>
> Following Open Cheer's entry, in July 2021 the USASF clarified the rule to event producers, stating that unless the ASWC 1) removed the word "world" from its name, 2) did not hold the competition on the same date as the USASF/IASF Worlds, and 3) discontinued awarding "world champion" titles at its event, then any event producers awarding bids to the ASWC would be ineligible to be USASF members. The USASF also stated that event producers outside the U.S. would be required to comply with these rules as well, and the message was shared with representatives of the IASF and ICU. . . . This language was not part of USASF membership agreements prior to Open Cheer's entry. The rule change also suggests that All Star cheer teams receiving USASF/IASF Worlds bids could not also participate in events produced by non-USASF members. . . .
>
> Throughout 2021 and 2022, the USASF and IASF communicated to their event producer members that any event producer that awarded bids to the ASWC or affiliated in any way with Plaintiffs Open Cheer or Open Series would be penalized. . . . In Section VI.B I identify eight event producers that awarded bids to the AWSC in the 2020-21 or 2021-22 season but stopped doing so after being informed that they would lose the ability to award USASF/IASF Worlds bids. Defendants' rules and the penalties described above forced event producers to pick between maintaining membership in the USASF/IASF and awarding bids to the ASWC. . . .

> Absent the restrictions imposed by Defendants' conduct, event producers would have had the freedom to produce the kinds of events that appealed to their customers. During the 2020-21 and 2021-22 seasons, many event producers attempted to award bids to the ASWC while maintaining their USASF or IASF membership. It was only after Defendants made clear that they intended to strictly enforce their group boycott that many event producers chose to either stop awarding bids for the ASWC or leave the USASF or IASF. This indicates that, absent Defendants' group boycott, many event producers would choose to award bids to the ASWC while remaining USASF and IASF members in the but-for world. The fact that Defendants' conduct has forced event producers to choose to stop doing business with one group or the other means that it restricted competition, i.e., event producers were not able to compete freely.

ECF No. 217-2 at 92–93, 95–96 (citations omitted); *see also id.* at 119 ("I identified eight event producers that either awarded bids to the ASWC or agreed to do so before being warned by the USASF or IASF that they would be penalized for doing so. After the warning, all event producers stopped awarding bids to the ASWC.").

The rest of this section of Léger's report is more of the same. Taking these allegations at face value, this is classic direct evidence of market power. *See, e.g., Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 (6th Cir. 2002) ("In determining whether conduct may be characterized as exclusionary, it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way. If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory [or exclusionary.]" (internal marks omitted)); William H. Page, *Direct Evidence of a Sherman Act Agreement*, 83 ANTITRUST L.J. 347, 348 n.9 (2020) (listing as examples of direct evidence "an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price," "a document or conversation explicitly manifesting the existence of the agreement in question," and "documents, meetings, and participant testimony … that the defendants exchanged commitments or otherwise collaborated by some means other than to make a marketplace decision").

16

This is relevant to both the market-definition analysis above and the market power discussion that follows. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 563 (2018) (Breyer, J., dissenting) ("[A] discussion of market definition was legally unnecessary at step 1. That is because the District Court found strong direct evidence of anticompetitive effects flowing from the challenged restraint."); *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects." (internal marks omitted)); *Great W. Directories, Inc. v. Sw. Bell Tel. Co.*, 63 F.3d 1378, 1384 (5th Cir. 1995), *opinion withdrawn and superseded in part*, 74 F.3d 613 (5th Cir. 1996), *vacated pursuant to settlement* (Aug. 21, 1996) ("It should be noted that the purpose of the market definition and market power inquiry is to determine whether an arrangement has the potential for genuine adverse affects on competition. Proof of actual detrimental effects can obviate the need for the inquiry into market power."). *But see New Orleans Archdiocesan Cemeteries*, 56 F.4th at 1036 n.13 ("[S]ubsequent Supreme Court precedent has clarified that even when parties present direct evidence of anticompetitive effects, a market definition inquiry is necessary." (citing *Am. Express Co.*, 585 U.S. 529)).

Defendants also argue that Léger fails to offer any evidence of indirect market power. *See* ECF No. 217-1 at 15 ("[I]f there are low or no barriers to entry, even a high market share does not indicate market power. . . . The record facts are that there are no significant barriers to enter the All Star Cheer competition market."). These arguments fall flat, too.

As Plaintiffs argue at length, market power is simply "the ability to raise prices above those that would be charged in a competitive market." ECF No. 232 at 17 (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984)). It can be shown

through direct evidence, as discussed above, and also through "direct effects or indirect inferences." *Id.* (citing *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 984 (9th Cir. 2023)). Léger offers more than enough evidence for this line of testimony. For example, he discusses internal Varsity documents that "reflect its understanding of this dynamic and its stated goal to raise prices following the acquisition" of JAM Brands in 2015 and Jam Spirit Group in 2017. ECF No. 217-2 at 74. Other Varsity documents state that while "Varsity will not be able to change data, locations, or pricing materially in year one" after an acquisition, it would be able to "[o]ptimize [increased] pricing, sales efforts, and improved event planning" in the following years. *Id.* n.278; *see also id.* at 75 ("Varsity's responses to questions posed by Bain Capital indicate Varsity is able to not only increase price but also direct customers to those All Star Cheer Competitions where Varsity earns higher margins."); *id.* at 230 ("Varsity's average revenue from registrations was $210 per athlete in the 2017–18 season, increasing to $338 in the 2024–25 season. This represents an average increase of 7.0% per year over the course of seven years. Varsity increased its average registration price even faster between 2021–22 and 2024–25, when the rate was 9.4%." (internal citation omitted)).

Defendants' objections to these opinions are objections to their conclusions, not to their reliability or relevance. Léger's indirect market power opinions are admissible.

### C. Léger's "Restricted Competition" Opinion

Defendants also argue that "Léger's opinion that the 'challenged conduct' 'restricted competition'" is "based on no analysis or methodology," rendering it unhelpful factual narrative rather than an admissible expert opinion. ECF No. 217-1 at 19. "Instead of providing actual analysis," Defendants write, "Léger simply identifies a few event producers that he says would have awarded bids to ASWC if they could have done so and remained in the USASF." *Id.* at 20. They conclude by calling Léger's anticompetitive-outcome opinion "laughable on its face." *Id.* at 21.

18

But this is not what a review of Léger's report shows. As Plaintiffs note, Léger "integrates documents, data, and industry testimony to assess anticompetitive effects, such as market foreclosure and harm to consumers." ECF No. 232 at 20. In particular, he offers in-depth analysis of participant numbers, revenue, and costs to "calculate Deep South's damages under each of . . . four scenarios described" earlier in his report. ECF No. 217-2 at 117. He relies on mathematical formulas to perform "a simple regression using data on costs at 21 of Deep South's events during the damages period" to arrive at estimated damages figures. *Id.* He finally settles on precise damages estimates for both the 2022–23 and 2023–24 seasons, concluding that possible damages "range from $1.52 million in Scenario 2 to $3.61 million in Scenario 1." *Id.* at 118. His analysis is careful and measured: Léger says his "preferred estimate is Scenario 4, which uses the growth rate at the comparable USASF/IASF Worlds bid event produced by All Out Championships as a benchmark for the growth at Deep South's USASF/IASF Worlds bid events and results in" a middle-of-the-road damages "estimate of $2.27 million." *Id.*

Defendants' quibbles with this aspect of Léger's report are again more about Léger's conclusions and less about his methodology. Léger's restricted-competition opinion is admissible.

### D. Adverse Effects on Competition Opinion

Defendants next levy a series of criticisms against Léger's harm and damages opinions. Their first set of arguments focus on the reliability of the opinions themselves. Their final argument is that two (out of six total) benchmarks in Léger's rebuttal report must be excluded as untimely disclosed.

Defendants' opening salvo is that Léger's harm and damages opinions are inadmissible as to Plaintiff Open Cheer. Defendants summarize this opinion as follows:

> Léger concludes that, had USASF and IASF allowed event producers to remain in USASF/IASF and give bids to ASWC, a group of eight event producers would have also given bids to ASWC, thus enriching the Open through (a) fees that event producers sometimes pay to the Open to be part of the "Open Series" and (b) through additional registrations at ASWC.

19

ECF No. 217-1 at 22. As to event fees, Defendants contend that Léger "did not account for the costs of providing the services." *Id.* at 23. As for registrations, Defendants say Léger's opinion is inadmissible because he "speculates that, had the eight event producers he identifies been allowed to give bids to ASWC, more teams would have come to ASWC." *Id.*

But as Plaintiffs note, a well-worn antitrust principle holds that once a plaintiff "prove[s] the fact of antitrust damages," a "more relaxed burden of proof obtains for the amount of damages than would justify an award in other civil cases." *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n,* 213 F.3d 198, 207 (5th Cir. 2000). In other words, antitrust plaintiffs are not required to prove the exact amount of damages once they have proven the fact of *some* damages. Even so, "this tolerant view is limited by our responsibility not to allow damages to be determined by 'guesswork' or 'speculation;' we must at least insist upon a 'just and reasonable estimate of the damage based on relevant data.'" *Id.* (quoting *Lehrman v. Gulf Oil Corp.,* 464 F.2d 26, 46 (5th Cir. 1972)). Here, as already noted, Léger has offered an admissible opinion as to the fact of at least some alleged damages. He was not required to prove those damages to a mathematical certainty for his expert opinion to be admissible.

Defendants next turn to Deep South. They argue that Léger's "opinion that Deep South was 'harmed' should be excluded because he looked at only two of Deep South's many events." ECF No. 217-1 at 24. But Defendants neglect to mention that these two events were the crucial "bid" events that the entire cheer industry revolves around. It is irrelevant whether Léger "account[ed] for the possibility that participants lost from Deep South's two USASF/IASF Worlds bid events were 'recaptured' by Deep South's other events" when those other events cannot award bids to the all-important end-of-season events. ECF No. 217-2 at 236. What Léger actually did was "identif[y] five events that awarded USASF/IASF Worlds bids for the first time and compared the number of team registrations in the first year with USASF/IASF Worlds bids to the number

20

in the last year without USASF/IASF Worlds bids." *Id.* at 237. He found that "[m]ost of the new USASF/IASF Worlds bid events saw increases in registrations in line with the 169% estimate in [his] regression" model estimates. *Id.* His conclusion is one all parties in this case agree on: "USASF/IASF Worlds bids are highly desirable and substantially increase registrations," and the loss of the right to award these bids can be a massive blow to event producers such as Plaintiffs. *Id.* So Defendants are wrong to suggest that Léger's opinion as to Deep South's damages is inadmissible simply because it concentrates on what were arguably Deep South's two most important events.

Defendants' final argument is that Léger's rebuttal report "puts forward *two entirely new damage analyses*." ECF No. 217-1 at 29 (emphasis in original). Defendants ask the Court to exclude these damages calculations as untimely disclosed. Plaintiffs cite Rule 26 in response, which allows experts to disclose new evidence "intended solely to contradict or rebut evidence on the same subject matter identified by" the opposing party within 30 days after the other party's disclosure. ECF No. 232 at 25 (citing FED. R. CIV. P. 26(a)(2)(D)(ii)). As a fallback, Plaintiffs say "[t]o the extent this is a supplemental opinion, it was timely made after the new information was provided by Defendants." *Id.* Plaintiffs do not point the Court to any purportedly new information.

Here, Defendants have the better of the argument. Plaintiffs neither identify the evidence these benchmarks are "intended solely to contradict or rebut" nor identify whatever new information Defendants supposedly provided. Thus, these two damages benchmarks must be excluded.

CONCLUSION

The Court **GRANTS** in part and **DENIES** in part both the Szymanski Motion (ECF No. 211) and the Léger Motion (ECF No. 216).

21

SO ORDERED.

May 27, 2026

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

22